David Wayne DeBLANC, Appellant,

v.

The STATE of Texas, Appellee.

No. 69580.

Court of Criminal Appeals of Texas, En Banc.

Oct. 24, 1990.

Rehearing Overruled Nov. 28, 1990.

Craig A. Washington, David L. Boddie, Houston, for appellant.

Michael R. Little, Dist. Atty. and Jerry E. Andress, Asst. Dist. Atty., Liberty, Robert Huttash, State's Atty., Austin, for the State.

Before the court en banc.

## OPINION

McCORMICK, Presiding Judge.

A jury convicted appellant, David Wayne DeBlanc, of capital murder. After the jury answered the special issues in the affirmative, the trial court assessed the death penalty as punishment. On appeal to this Court, appellant raises twelve points of error. We will affirm.

■ In his first point of error, appellant asserts that the trial court should have sustained his motion for a change of venue, see Article 31.03, V.A.C.C.P., without holding a hearing thereon because the controverting affidavits filed by the State pursuant to Article 31.04, V.A.C.C.P.,[1] in response to his motion are in improper form. We disagree.

---

1. Article 31.04 provides:
 "The credibility of the persons making affidavit for change of venue, or their means of knowledge, may be attacked by the affidavit of a credible person. The issue thus formed shall be tried by the judge and the motion granted or refused, as the law may require."

The seven affidavits filed by the State aver that appellant's "affiants of said affidavit are not credible as they are prejudiced to said Defendant." The State's affiants also attack the credibility of appellant's affiants stating that "their means of knowledge are not sufficient to support and justify the statements contained therein." This Court has determined that wording identical to that found in the State's affidavits is sufficient to comply with Article 31.04. See *Cockrum v. State*, 758 S.W.2d 577, 582 (Tex.Cr.App.1988). See also *Lundstrom v. State*, 742 S.W.2d 279, 282 (Tex.Cr.App.1986) (holding that when a defendant puts on evidence concerning the reasons for the change of venue and allows the State to do the same, the issue becomes one of fact for the trial court and the defendant waives his right to assert that he is entitled to a change of venue as a matter of law.) Accordingly, appellant's first point of error is overruled.

■ In his second point of error, appellant asserts that the trial judge abused his discretion when, after conducting a hearing thereon, he refused to grant the motion for a change of venue which alleged that appellant was unable to receive a fair trial in Liberty County due to pretrial publicity.

At the hearing on the change of venue, appellant introduced testimony from several witnesses. Most of these witness testified that in their opinion appellant could not obtain a fair trial in Liberty County. But not all of appellant's witnesses agreed. A news director for a local newspaper was called by appellant yet he testified that news about the murder for which appellant was indicted "wasn't given that much play" in the newspaper. Appellant called the owner of another local newspaper and he testified that "considering the heinousness of the crime, I think it's been a fairly low level thing." His newspaper had not published anything concerning the murder. He also testified that the other papers in town had handled the matter "very professionally." One of the owners of a local radio station testified that out of the approximately 873 days between the trial date and the date of the murder, there were only fourteen days where the victim's death or appellant's trial had been mentioned on the air. He testified that it was the policy of his station not to sensationalize the trial.

After appellant's witnesses testified, the State introduced the testimony of twenty-five witnesses. Suffice it to say the State's witnesses testified that appellant could receive a fair trial in Liberty County. They based their conclusions on the lack of publicity and gossip that the media and the people of the county gave to either the murder or appellant.

■ The test to be applied in determining whether a trial court should grant a motion to change venue is whether the outside influences affecting the community climate of opinion as to a defendant are inherently suspect. *Beets v. State*, 767 S.W.2d 711, 742 (Tex.Cr.App.1989) (opinion on rehearing); *Phillips v. State*, 701 S.W.2d 875, 879 (Tex.Cr.App.1985) cert. denied, 477 U.S. 909, 106 S.Ct. 3285, 91 L.Ed.2d 574 (1986). The defendant seeking a change of venue "bears a heavy burden to prove the existence of such prejudice in the community that the likelihood of obtaining a fair and impartial jury is doubtful." *Nethery v. State*, 692 S.W.2d 686, 694 (Tex. Cr.App.1985) cert. denied, 474 U.S. 1110, 106 S.Ct. 897, 88 L.Ed.2d 931 (1986). Merely because a particular case is publicized in the media does not give rise to an automatic showing of prejudice such that a defendant is entitled to a venue change—jurors do not have to be totally ignorant of the facts and issues of a particular case. *Murphy v. Florida*, 421 U.S. 794, 801, 95 S.Ct. 2031, 2036, 44 L.Ed.2d 589 (1975); *Eckert v. State*, 623 S.W.2d 359, 363 (Tex.Cr.App. 1981), *overruled for other reasons in Reed v. State*, 744 S.W.2d 112 (Tex.Cr.App.1988). Rather, for a defendant to prevail in his motion to change venue, he or she must demonstrate that publicity about the case is pervasive, prejudicial and inflammatory; that is, a defendant must demonstrate an "actual, identifiable prejudice attributable to pretrial publicity on the part of the community from which members of the jury will come." *Ransom v. State*, 789 S.W.2d

572, 578–579 (Tex.Cr.App.1989) cert. denied, —— U.S. ——, 110 S.Ct. 3255, 111 L.Ed.2d 765 (1990), citing *Beets*, 767 S.W.2d at 743 and *Faulder v. State*, 745 S.W.2d 327, 338 (Tex.Cr.App.1987). See also *Eckert*, 623 S.W.2d at 363–364; *McManus v. State*, 591 S.W.2d 505, 517–518 (Tex.Cr.App.1979); *Freeman v. State*, 556 S.W.2d 287, 296–298 (Tex.Cr.App.1977) cert. denied, 434 U.S. 1088, 98 S.Ct. 1284, 55 L.Ed.2d 794 (1978).

On appeal, the standard of review for this Court is whether the trial court abused its discretion in refusing to grant the change of venue. *Ransom*, 789 S.W.2d at 579. The introduction of the various witnesses' testimony at the hearing on the motion to change venue, made a factual dispute for the trial court's resolution as to whether appellant could receive a fair trial in Liberty County. The trial court found, and the record adequately supports the finding, that appellant could receive a fair trial. As such, we hold that the trial court did not abuse its discretion in this case when it denied appellant's motion for a change of venue.

■ Appellant, after trial began, filed a motion to recuse the judge; in his third point of error, appellant maintains that he should have been afforded a hearing on the merits of this motion with some judge other than the one presiding over his trial.[2] Appellant relies upon Article 200a, Section 6, of the Texas Revised Civil Statutes, which provides in part that "[a] district judge shall request the presiding judge to assign a judge of the Administrative District to hear and assign motions to recuse such district judge from a case pending in his court." Appellant insists that the mandatory language of this Article mandates that he be provided a hearing before another judge whenever he presents a motion to recuse the presiding judge. Because such was not done in this case, appellant asserts that he is entitled to a new trial. See *McLeod v. Harris*, 582 S.W.2d 772 (Tex. 1979). We cannot agree with appellant.

We hold that Article 200a, Section 6, must be read in conjunction with Rule 18a of the Texas Rules of Civil Procedure. That Rule provides, in part:

"At least ten days before the date set for trial or other hearing in any court other than the Supreme Court, the Court of Criminal Appeals or the court of appeals, any party may file with the clerk of the court a motion stating grounds why the judge before whom the case is pending should not sit in the case."

Failure to comply with the ten day notice provision of Rule 18a bars complaint on appeal of the denial of a separate hearing before another judge on the motion to recuse. *Accord: Thibodeaux v. State*, 726 S.W.2d 601, 605 (Tex.App.—Houston [14th Dist.] 1987, no pet.); *Autry v. Autry*, 646 S.W.2d 586, 588 (Tex.App.—Tyler 1983, no writ); *Gonzalez v. Gonzalez*, 659 S.W.2d 900, 901–902 (Tex.App.—El Paso 1983, no writ); *Limon v. State*, 632 S.W.2d 812, 815 (Tex.App.—Houston [14th Dist.] 1982, pet. ref'd). Rule 18a obviously presupposes that litigants should not be able to halt judicial proceedings at will by the simple invocation of the mandatory provisions of Article 200a, section 6. See *Chastain v. State*, 667 S.W.2d 791, 795 (Tex.App.—Houston [14th Dist.] 1983, pet. ref'd). In the case at bar, appellant failed to comply with Rule 18a and as such he will not be heard to complain on appeal of the denial of an opportunity to have his motion heard by a judge other than the one assigned to his case.[3]

In his fourth point of error, appellant insists that the trial court erred when it

---

**2.** The trial court submitted appellant's motion to the Administrative Judge who refused to assign another judge to hear the merits of the motion. The Administrative Judge indicated in his order that the refusal was based upon the untimeliness of appellant's motion. Fifteen days later appellant filed his second recusal motion. The trial court judge also submitted this motion to the Administrative Judge who again indicated, in an order refusing to appoint another judge to hear the merits, that the motion was untimely.

**3.** Appellant's only complaint on appeal is that the Administrative Judge would not appoint another judge to hear his motion to recuse. He does not complain that the trial court judge presiding over his case abused his discretion when he did not recuse himself.

refused to quash the indictment. The basis of appellant's motion to quash was that he was compelled to appear and testify before a Grand Jury that investigated the capital murder offense for which he was eventually indicted by another Grand Jury.[4] He asserts that this violated his Sixth Amendment right to an attorney and his Fifth Amendment right against compelled testimony along with the analogous rights found in Article I, Section 10 of the Texas Constitution.

We summarily dismiss appellant's Sixth Amendment claims since his right to an attorney under that Amendment did not arise until after he was indicted. *United States v. Gouveia*, 467 U.S. 180, 187, 104 S.Ct. 2292, 2297, 81 L.Ed.2d 146 (1984).

We also reject appellant's Fifth Amendment arguments. As stated by the Supreme Court: "Neither justice nor the concept of a fair trial requires that the Supreme Court establish a rule permitting defendants to challenge indictments on the ground that they are not supported by adequate or competent evidence." *Costello v. United States*, 350 U.S. 359, 364, 76 S.Ct. 406, 409, 100 L.Ed. 397 (1956). Indeed, the Supreme Court has squarely decided the issues concerning appellant's Fifth Amendment argument adversely to him in *Lawn v. United States*, 355 U.S. 339, 348–350, 78 S.Ct. 311, 317–18, 2 L.Ed.2d 321 (1958).

Finally, Texas law, following that established by the Supreme Court, provides that a reviewing court will not go behind the actions of the Grand Jury to determine whether the indictment was properly re-

turned. *Tarpley v. State*, 565 S.W.2d 525, 532 (Tex.Cr.App.1978). Because appellant provides neither argument nor authority, based upon the Texas Constitution, to support overruling our case law, we consider the issue inadequately briefed and will not address it. See *McCambridge v. State*, 712 S.W.2d 499, 501–502 n. 9 (Tex.Cr.App.1986). Consequently, appellant's fourth point of error is overruled.

In his fifth point of error, appellant claims that subsections (2) and (3) of Article 35.16(a), V.A.C.C.P., are "partially unconstitutional." Specifically, he claims that the Article has no "rational basis" and works to prevent minorities and the poor from serving on juries. Thus, appellant concludes that the Article is violative of the Fifth, Sixth and Fourteenth Amendments and Article I, Section 10 of the Texas Constitution.[5]

Article 35.16, in pertinent part, provides that:

"(a) A challenge for cause is an objection to a particular juror, alleging some fact which renders him incapable of unfit to serve on the jury. A challenge for cause may be made by either the State or the defense for any one of the following reasons:

\* \* \* \* \* \*

"2. That he has been convicted of theft or any felony;
"3. That he is under indictment or other legal accusation for theft or any other felony;

\* \* \* \* \* \*

---

4. In his brief, appellant simply asserts that he was compelled to testify before the grand jury—nothing even remotely akin to evidentiary support is cited in the brief. Our reading of the record indicates that at the hearing on the motion to quash, appellant, in response to being subpoenaed by the grand jury, merely answered the subpoena and testified. At no time during the proceedings did appellant request to remain silent and at no time during the proceedings did appellant ask to speak to his attorney.

We note further that the State did not use any portion of the grand jury testimony at trial.

5. A litigant has standing to challenge the constitutionality of a statute only insofar as it adversely affects his own rights. *Ulster County Court v.*

*Allen*, 442 U.S. 140, 154–155, 99 S.Ct. 2213, 2223, 60 L.Ed.2d 777 (1979). That is, when challenging the constitutionality of a statute, the defendant must clearly show that it is unconstitutional as to him in his situation—that the statute may be unconstitutional as to others is not sufficient. See *Parent v. State*, 621 S.W.2d 796, 797 (Tex.Cr.App.1981). Because no venireperson was disqualified from jury service because of Article 35.16(a)(3), appellant has no standing to assert that that subsection is unconstitutional. One venireperson, however, was disqualified from jury service because of Article 35.16(a)(2); consequently, we will address only appellant's claim that that subsection is unconstitutional.

"No juror shall be impanelled when it appears that he is subject to the second, third or fourth grounds of challenge for cause set forth above, although both parties may consent.

All other grounds for challenge may be waived by the party or parties in whose favor such grounds exist."

Repeating language found in Article 35.16, V.A.C.C.P., Article 35.19, V.A.C.C.P., provides that "[n]o juror shall be impanelled when it appears that he is subject to the second, third or fourth cause of challenge in Article 35.16, though both parties may consent."

Initially, we note that the requirement that all jurors who serve on the jury must not have been convicted of theft is obviously to insure the probity of the jury and therefore the Article has a rational basis. See *United States v. Foxworth,* 599 F.2d 1, 4 (1st Cir.1979) and the cases cited therein. Although no case on point from this Court can be found, several cases from the United States Supreme Court lead us to believe that the provisions under attack in this case are constitutionally sound.

We readily accept that "[o]nce the State chooses to provide grand and petit juries ... it must hew to constitutionally required criteria in ensuring that the selection of membership is free of racial bias." *Carter v. Greene County,* 396 U.S. 320, 330, 90 S.Ct. 518, 524, 24 L.Ed.2d 549 (1970). In *Franklin v. South Carolina,* 218 U.S. 161, 30 S.Ct. 640, 54 L.Ed. 980 (1910), the Supreme Court examined a law which provided that jurors were to be selected by county commissioners who were to "prepare a list of such qualified electors, under the provisions of the constitution, between the ages of twenty-one and sixty five, and of good moral character, of their respective counties as they may deem otherwise well qualified to serve as jurors, being persons of sound judgment and free from all legal exceptions, which list shall include not less than one form every three of such qualified electors...." In upholding the validity of these standards, the Court wrote:

"We do not think there is anything in this provision of the statute having the effect to deny rights secured by the Federal Constitution.... There is nothing in this statute which discriminates against individuals on account of race or color or previous condition, or which subjects such persons to any other or different treatment than other electors who may be qualified to serve as jurors. The statute simply provides for an exercise of judgment in attempting to secure competent jurors of proper qualifications." *Franklin,* 218 U.S. at 161, 30 S.Ct. at 640.

Thereafter, in *Smith v. Texas,* 311 U.S. 128, 61 S.Ct. 164, 85 L.Ed. 84 (1940), the Court examined one of the predecessor statutes to Article 35.16. That statue provided for wide discretion to be vested in county commissioners, yet the Supreme Court upheld its validity, expressly holding that the statutory scheme was not in and of itself unfair since it was "capable of being carried out with no racial discrimination whatsoever." 311 U.S. at 130–131, 61 S.Ct. at 165.

No less can be said of the Article under attack in this case. The provision is devoid of any mention of race or status as a basis for disqualification and there is absolutely no evidence contained in the record before us that the law was adopted or subsequently carried forward with the purpose of fostering discrimination. Cf., *Louisiana v. United States,* 380 U.S. 145, 85 S.Ct. 817, 13 L.Ed.2d 709 (1965). (Court invalidated provision of Louisiana constitution that vested in the State's voting registrars "a virtually uncontrolled discretion as to who should vote and who should not," and which had been abused "to deprive otherwise qualified Negro citizens of their right to vote.") Indeed, under the provisions of the Article, *all* persons who have been convicted of theft are deemed disqualified to serve on the jury and neither the State nor the defendant can consent to waive this disqualification. Article 35.16, supra; Article 35.19, supra. See, e.g., *Thomas v. State,* 796 S.W.2d 196, 197 (Tex.Cr.App. 1990). We overrule appellant's fifth point of error.

In his sixth point of error, appellant asserts that the trial court erred in failing to quash the array. He alleges that the list of names containing the qualified voters in Liberty County, the source of potential jurors, is composed of only 9.2 per cent black persons whereas blacks comprise about 15 per cent of that county's population. Appellant asserts that this disparity is violative of the Sixth Amendment right to be tried by a jury drawn from a fair cross-section of the community.[6]

The use of voter registration lists to gather potential jurors in Texas courts has been upheld against similar attacks by this Court in *Shelby v. State*, 479 S.W.2d 31, 40 (Tex.Cr.App.1972). Also, the use of voter registration lists to gather potential federal jurors, per 28 U.S.C., section 1861 et seq., has been uniformly held to be constitutional. See *United States v. Test*, 550 F.2d 577, 581–593 (10th Cir.1976) and cases cited therein, cert. denied, 420 U.S. 28, 95 S.Ct. 749, 42 L.Ed.2d 786 (1977). These cases fairly dispose of appellant's claims. We hold that appellant's Sixth Amendment rights were not violated; consequently, his sixth point of error is overruled.

In his seventh point of error, appellant complains that the trial court erred in disqualifying a vireman from jury service. We disagree. The vireman had been convicted of theft and was therefore absolutely disqualified from service on the jury. Article 35.16(a)(2), V.A.C.C.P.; Article 35.19, V.A.C.C.P. See *Thomas v. State*, supra, at 197. Appellant asserts that the venireperson's disqualification had been removed by an order commuting the sentence. This is incorrect.

This Court has held that the legal effect of a commutation on a person's status is as though the person's sentence had originally been assessed at the commuted punishment. *Ex parte Freeman*, 486 S.W.2d 556, 587 (Tex.Cr.App.1972). "Commutation of sentence ... has no effect on the adjudged guilt of the prisoner." *Freeman*, 486 S.W.2d at 587. Because the person still stands convicted, under both Articles 35.16 and 35.19, the person is still disqualified to serve on the jury. Appellant's seventh point of error is overruled.

Appellant complains in his eighth point of error that the trial court committed reversible error when it failed to include in the charge to the jury an instruction that one of the State's witnesses, who had been indicted along with appellant for capital murder, was an "accomplice as a matter of law." Again we disagree with appellant.

[13] In Texas, "[a] conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant to the offense." Article 38.14, V.A.C.C.P. See, e.g., *Cockrum v. State*, 758 S.W.2d 577, 579–582 (Tex.Cr.App.1988). We have held that "questions as to whether an inculpatory witness is an accomplice, it is proper to leave that issue to the jury, under instructions defining the term 'accomplice.'" See *Gonzales v. State*, 441 S.W.2d 539, 541 (Tex.Cr.App.1969). Where, however, there exists no doubt or the evidence clearly shows that a witness is an accomplice witness as a matter of law "the court is under a duty to so instruct the jury." Id., citing as controlling authority 24 Tex.Jur.2d, *Evidence*, Section 691 (1964). A State's witness who has been indicted for the same offense as the defendant is considered to be an "accomplice as a matter of law."[7]

6. "Embedded in the traditional rules governing constitutional adjudication is the principle that a person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others in other situations." *Broadrick v. Oklahoma*, 413 U.S. 601, 610, 93 S.Ct. 2908, 2915, 37 L.Ed.2d 830 (1973). We are reluctant to hold that appellant has standing to challenge the use of the voter registration lists. Of the 138 persons to appear in response to the summons for jury service, fifteen were black. This means that blacks comprised roughly 11 per cent of the array and, as such, the percentage of potential black jurors on the array *in this case* was not significantly disproportional to the percentage of black persons residing in Liberty County. See *United States v. Test*, 550 F.2d 577, 586–587 (10th Cir.1976).

7. The State, in a supplemental brief, responds that the court-made rule—whenever a witness has been indicted for the same offense as the defendant and testifies for the State against the defendant the judge must instruct the jury that the witness is an accomplice is a matter of

■ Initially, we find that appellant failed to present his complaints to the trial court. We have reviewed the record in this case; the transcript of the court's documents contains a pleading entitled "Objections to the Court's Charge." The pleading is filed-stamped September 28, 1985—two days before the trial court read its charge to the jury.[8] However, there is absolutely no indication in the record that the document was ever presented to the trial judge. When the charge was read to the jury on September 30, 1985, appellant voiced no objection thereto. (Vol. LI, p. 1492). Moreover, there is no written ruling made by the trial court contained either on appellant's pleading itself or within any other instrument filed among the court's documents. It is axiomatic that before a party may assert error in any of the trial court actions that error must be brought to the trial court's attention. Merely filing written objections to the court's charge among the court's papers without bringing the specific objections to the trial court's attention is insufficient to preserve error for appellate review. *Marr v. State*, 383 S.W.2d 928, 929 (Tex.Cr.App.1964).

■ Our finding that appellant has failed to preserve error, however, does not end our inquiry. We have held that "[i]f the error in the charge was subject to a timely objection in the trial court, then reversal is required if the error is 'calculated to injure the rights of the defendant,' which means no more than that there must be *some* harm to the accused from that error." *Almanza v. State*, 686 S.W.2d 157, 171 (Tex.Cr.App.1984) (opinion on rehearing) (emphasis in the original). If, however, there is no proper objection voiced at the time of trial to the court's charge, the defendant "will obtain a reversal only if the error is so egregious and created such harm that he 'has not had a fair trial'—in short, 'egregious harm.' " 686 S.W.2d at 171. In both situations—where there is and where there is not a proper objection to error contained in the charge to the jury—the actual degree of harm "must be assayed in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record." 686 S.W.2d at 171. In the case before us, assuming that the trial court erred in refusing to instruct the jury that the State's witness was an "accomplice as a matter of law," we find the error in the charge not to be egregious for the following reasons.

On February 19, 1983, a housekeeper, Ethel Chargois, discovered the body of Father Henry Bouchie as she began her work

---

law—has none of the legal basis that it enjoyed under earlier case law. The State asks this Court to now reject the rule, asserting that:

"Although it cannot be reasonably argued that this is not the current state of the law, the State would propose that original reasoning for such an 'automatic' finding [that one is an accomplice as a matter of law] is no longer present in today's case law. Some of the earlier cases which refer to the aforementioned rule ... seem to rely upon Article 711 of the Code of Criminal Procedure of 1925. *Durham v. State*, [110 Tex.Crim. 25] 7 S.W.2d 92, (Tex.Cr.App.1928); *Herrera v. State*, [115 Tex.Crim. 526] 27 S.W.2d 211, (Tex.Cr.App. 1930). Even earlier cases relied upon Article 791 [of the] Code of Criminal Procedure of 1911. *Lowe v. State*, [98 Tex.Crim. 501] 267 S.W.2d [S.W.] 270, (Tex.Cr.App.1924). These statutes absolutely disqualified as a witness for the accused one who was indicted for the same offense.... *Lowe, Herrera,* and *Durham* (and others cited therein) reasoned that since a co-indictee could not be at all called as

witness for the accused, then the State would have to pay a price for calling that co-indictee as a witness. That price was that the co-indictee would be held to be an accomplice as a matter of law. Since there appears to be no similar statute in today's criminal law, the initial basis and reasoning for the 'automatic' finding no longer exists and this rule should be put to rest." State's Supplemental Brief at p. 12.

Because we find any error in the trial court's instructions to the jury to not be egregious, we will decline the State's invitation to review the court-made rule.

8. The trial judge began preparation of the court's charge on Friday, September 27, 1985, with all parties present. Upon completion, he adjourned for the weekend. Thereafter, on September 28th, a Saturday, appellant's counsel filed his written objections to the charge. The charge was read to the jury on Monday morning, September 30, 1985, immediately after the jury was seated.

at the rectory of Our Mother of Mercy Catholic Church. Father Bouchie had been fatally shot at close range and the living quarters of the rectory had been ransacked.

Arlington Mark, called as a witness by the State, testified against appellant. He told the jury how he and appellant had planned and executed the burglary of the church and its surrounding buildings. He had not planned with appellant, however, to burglarize the rectory, only the church, the school, the garage and the "old rectory." When the two men went to the church grounds, Mark had no weapon with him and believed that appellant was also unarmed. Once they were on the church grounds, Mark and appellant separated from each other. Mark saw appellant head towards the rectory and soon thereafter he heard three shots. After hearing the shots, Mark ran home. Mark told the jury that he also had been indicted for the capital murder of Henry Bouchie and neither the State nor the appellant refuted, questioned or disproved this testimony or any other testimony demonstrating Mark's participation in the burglary of the church buildings.

At the end of the guilt/innocence phase of trial, in its instructions to the jury, the trial court submitted the following:

"You are instructed that an 'accomplice,' as that term is here used, means anyone connected with the crime charged, as a party thereto, and includes all persons who are connected with the crime by unlawful act or commission on their part transpiring either before or during the time of the commission of the offense, and whether or not they were present and participated in the commission of the crime. A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible or by both."

In connection with this definition of "accomplice," the trial court further instructed the jury regarding parties' liability:

"A person is criminally responsible for an offense committed by the conduct of another if, acting with the intent to promote or assist the commission of the offense, he solicits, encourages, directs, or aids or attempts to aid the other person to commit the offense. The term 'conduct' means any act or omission and its accompanying mental state."

Finally, the "accomplice instruction," tracing (and adding to) the wording found in Article 38.14, V.A.C.C.P., informed the jury that:

"You are further instructed that a conviction cannot be had upon the testimony of an accomplice unless the jury first believe that the accomplice's evidence is true and that it shows the defendant is guilty of the offense charged against him, and even then you cannot convict unless the accomplice's testimony is corroborated by other evidence tending to connect the defendant with the offense charged, and the corroboration is not sufficient if it merely shows the commission of the offense. . . ."

Significantly, in his final arguments to the jury, the prosecutor readily admitted: *"The State brought you only one witness up here . . . that was an accomplice.* And you can't convict unless you believe it's true and there is other evidence tending, tending to connect the Defendant to the offense.

"Ladies and gentlemen, I'm here to tell you that *you . . . can set aside the testimony of Arlington Gary Mark and completely disregard it if you want to* and there is still sufficient, overwhelming evidence, that points to the guilt of that Defendant right over there.

"[Y]ou don't have to believe Arlington Gary Mark if you don't want to, ladies and gentlemen. *Set it aside.* What are you going to do about the other witnesses?" (Emphasis added.)

Given the unrefuted, unquestioned evidence that Mark was an active participant in the murder of Father Bouchie, along with the expansive accomplice witness instructions given in this case and the prosecutor's affirmation to the jurors in his final argument that Mark was an accomplice, only an unreasonable jury would find that

the State's witness was not an accomplice and consequently would base appellant's conviction solely upon this witness's testimony. We will "presume[ ] that jurors, conscious of the gravity of their tasks, attend closely the particular language of the trial court's instructions in criminal cases and strive to understand, make sense of, and follow the instructions given them." *Francis v. Franklin,* 471 U.S. 307, 324 n. 9, 105 S.Ct. 1965, 1976 n. 9, 85 L.Ed.2d 344 (1985). See also *Parker v. Randolph,* 442 U.S. 62, 75 n. 7, 99 S.Ct. 2132, 2140 n. 7, 60 L.Ed.2d 713 (1979) ("The rule—indeed, the premise upon which the system of jury trials function under the American judicial system—is that juries can be trusted to follow the trial court's instructions.") Therefore, we hold that any error concerning the trial court's failure to instruct the jury that Arlington Mark was an "accomplice as a matter of law" to not be egregious. Accordingly, appellant's eighth point of error is overruled.

In his ninth point of error, appellant claims that the prosecutor improperly used his peremptory strikes to exclude from the jury members that were of the same race as appellant. See *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). This case was tried before the Supreme Court issued its opinion in *Batson.* The appeal of this case, however, was pending in this Court at the time of the decision. In *Griffith v. Kentucky,* 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987), the Supreme Court indicated that the holding in *Batson* would extend to all cases currently on appeal. We therefore abated the appeal in this case and remanded the cause to the trial court to conduct a hearing in accordance with the *Batson* decision. *DeBlanc v. State,* 732 S.W.2d 640, 642 (Tex.Cr.App. 1987). The trial court has complied with our order and the transcription from the *Batson* hearing is now before us.

 At the hearing, after the defense presented evidence that the State used four of its peremptory strikes to remove those remaining potential black jurors after the initial disqualifications, the trial court found a prima facie showing of discrimination. Thereafter, the State explained the use of its peremptory challenges as follows:

*Venireman W. Jones:*

The prosecutor explained that he struck venireman Jones because the venireman knew appellant's mother; during the voir dire he referred to her by her first name. Also the venireman stated that he had religious scruples against the death penalty. He testified he would answer one of the special issues in the negative regardless of the evidence presented because he did not agree with the death penalty. Moreover, the venireman was in bad health. He was a diabetic, had high blood pressure, high blood sugar levels, and had ulcers. He indicated during voir dire that his ailments would prevent him from serving on the jury. This is supported by the record of the voir dire which contains the testimony of the venireman's physician who testified that the venireman's service on the jury would be injurious to his health.

*Venireman Johnson:*

The prosecutor testified that he struck venireman Johnson because during the voir dire she avoided directly answering questions concerning the death penalty. When asked about her feelings about the death penalty, she stated that "I just believe in justice." The prosecutor surmised from her indirect responses that the venireman did not believe in the death penalty. Overall, the venireman's responses to questions, and in particular the fact that the venireman would alter her views on capital punishment depending on whether the prosecutor or the defense attorney asked the questions, led the prosecutor to believe that the venireman was opposed to the death penalty. The prosecutor was, in particular, preoccupied by the venireman's response during the voir dire where she specifically testified that she was against the death penalty and, quoting from the Bible, stated, "thou shall not kill."

Further, the venireman testified that she would require the State to prove motive and premeditation before she could convict someone of murder or capital murder. The

prosecutor also testified that he thought the venireman would hold the State to a higher burden of proof than that of beyond a reasonable doubt at the punishment phase of a capital murder trial because she had stated that she would have to be "absolutely sure" before she answered the punishment questions in the affirmative. Moreover the venireman knew appellant along with his sister. She testified during voir dire that she sang next to appellant's sister in the church choir.

*Venireman A. Jones:*

The prosecutor testified that he struck Adeline Jones because of her health. She told the judge that she had endured two strokes and as a result she suffered from seizures and was subject to black-outs. She was on medication for these problems.

In addition to the health problems, the venireman testified during voir dire that because of her religious beliefs she was opposed to the death penalty. The venireman also believed that it would be practically impossible to prove what a person would do in the future. This led the prosecutor to believe that she would have "definite problems" with the future dangerousness issue of the capital murder statute. Moreover, the venireman knew appellant for three or four years and at one time appellant's uncle was married to her sister. She referred to appellant by his first name. She also knew appellant's mother and father along with most of their other relatives. She testified that because of her affiliation with the DeBlanc family serving on the jury would make her uncomfortable.

*Venireman Sterling:*

The prosecutor testified that he struck venireman Leo Sterling because he knew appellant's relatives. In particular, the venireman was first cousins with a man named Paul Stelley whose wife was kin to appellant. Moreover, Paul Stelley's son had also been charged with capital murder. The prosecutor testified that he prosecuted that case. The venireman knew Mrs. Luther Wells whose husband had testified at the hearing on the motion to change venue that appellant could not receive a fair trial in that county. The venireman also knew

Arlington Gary Mark. Mark had participated in the burglary and testified against appellant at trial (discussed above in response to appellant's eighth point of error). The prosecutor felt that anybody who knew Mark too well would have trouble believing his testimony.

The venireman during voir dire had indicated that at one time in his life he had been violently opposed to the death penalty. The prosecutor testified that the venireman "seemed hesitant" in answering questions concerning capital punishment. Moreover, he indicated that he would hold the State to a higher burden of proof than that of beyond a reasonable doubt in a capital murder case. At one time during voir dire, he indicated that he would have problems with a circumstantial evidence case.

Finally, after giving his specific explanations for his peremptory challenges, the prosecutor added that none of the reasons for striking any of the veniremen was based upon race. The prosecutor was unwavering upon being cross-examined by the defense. Appellant presented no additional evidence as to why the prosecutor's reasons were not worthy of belief. The trial court found that the State had presented race-neutral explanations.

In *Batson,* the Supreme Court reaffirmed prior holdings which precluded, as violative of the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution, the use of peremptory strikes to exclude members from jury service solely because of the members' race. See *Batson,* 476 U.S. at 84, 106 S.Ct. at 1716, citing *Swain v. Alabama,* 380 U.S. 202, 203–204, 85 S.Ct. 824, 826–27, 13 L.Ed.2d 759 (1965). See generally *Batson,* 476 U.S. at 84 n. 3, 106 S.Ct. at 1716 n. 3. The Court, however, broke away from prior holdings to alter the manner in which an aggrieved party may establish the discriminatory use of peremptory strikes. Under *Batson,* once the defendant makes out a "prima facie" showing of discrimination, the burden shifts to the State to explain adequately the use of its strikes. *Batson,* 476 U.S. at 94, 106 S.Ct. at 1721. More-

over, the *Batson* Court articulated that the State's burden "to explain adequately" cannot be met by a prosecutor's "mere general assertions" that she did not discriminate or that she properly performed her official duties. Id. "Rather, the State must demonstrate that 'permissible racially neutral selection criteria and procedures have produced the monochromatic result.'" Id., quoting *Alexander v. Louisiana,* 405 U.S. 625, 632, 92 S.Ct. 1221, 1226, 31 L.Ed.2d 536 (1972).

Recently, this Court "adopt[ed] the 'clearly erroneous' standard from the Federal Rules of Civil Procedure as the standard of review for appellate courts in addressing *Batson* issues." *Whitsey v. State,* 796 S.W.2d 707, 721 (Tex.Cr.App. 1990) (opinion on rehearing). Further, we explicated that:

> "Although the meaning of the phrase 'clearly erroneous' is not immediately apparent, certain general principles governing the exercise of the appellate court's power to overturn findings of a district court may be derived from our cases. The foremost of these principles ... is that a finding is 'clearly erroneous' when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. This standard plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have

decided the case differently. The reviewing court oversteps the bounds of its duty ... if it undertakes to duplicate the role of the lower court. In applying the clearly erroneous standard to the findings of a district court sitting without a jury, appellate courts must constantly have in mind that their function is not to decide factual issues *de novo.* If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Whitsey,* 796 S.W.2d at 721–722 (original punctuation altered and citations omitted), quoting *Anderson v. Bessemer City,* 470 U.S. 564, 573–574, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985).

The trial court found the prosecutor's explanations to be "race-neutral" and there is nothing before us to suggest otherwise. Using the *Whitsey/Anderson* standard of review in the case before us, we find that the trial court's findings are not clearly erroneous. Appellant's ninth point of error is overruled.

 In his tenth point of error, appellant raises complaints concerning the State's sustained challenges for cause to six of the venireman.[9] The following is the

---

9. We will examine only those veniremen complained of in appellant's point of error when the record reveals that appellant has properly preserved error for our review. In his brief, among those veniremen discussed in the body of this opinion, appellant complains that the trial court improperly excused venireman Martin. We find, however that any issue regarding this prospective juror is not before us.

During voir dire, venireman Martin indicated that she had recently lost a brother and her mother. She also related to the court that she had emphysema and was "totally disabled." She was on medication. Moreover, she clearly stated that she was "totally opposed" to the death penalty. She indicated that she could not set her personal convictions aside and judge the case on the facts presented. The judge excused the venireman, commenting that he was doing

so for both "hardship" reasons and because he had reservations about whether she could "really answer" the questions concerning her views about the death penalty posed to her from the bench and from defense counsel. After the trial court excused the potential juror, counsel for appellant merely stated, "Please note our exception to the Court's ruling." It is uncertain whether the defense objected to the venireman being excused for hardship reasons (of which he does not complain on appeal) or because her views concerning the death penalty would not prevent or substantially impair her duties as a juror. Nevertheless, on appeal appellant asserts that the juror was improperly excused because she "never stated that her views on capital punishment would prevent or impair the performance of her duties as juror in accordance with her instructions and her oath." Appellant's Brief at p. 27. Because appellant does not ques-

voir dire examination of the prospective jurors:

*Venireman Seale:*

The trial court, the State and appellant examined venireman Seale. In response to questioning by the trial court, the venireman repeatedly indicated that she did not know if she could be a participant in a capital murder case. She answered a jury questionnaire and therein indicated that she could "never under any circumstances" render a guilty verdict in a capital case. Upon examination by the trial court, however, she somewhat retracted that answer, telling the judge:

"Well, I say—now, I may be contradicting myself. I'm going to say yes, I guess I could. But I really don't know, if I was to do it, whether I could say that I could live with it, is what I'm trying to say. I don't know if I did do something like that and then later found out that this wasn't true of the person that was convicted, I don't know whether I could live with myself. I don't know how it would affect me."

Thereafter, throughout her examination by the trial court, the venireman repeatedly indicated that she was uncertain as to whether she could decide the issues in a capital murder case.

Upon examination by the State, the venireman remained just as uncertain. Typical of her responses to the prosecutor's questions is the following:

"Q. A juror decides the facts of a case upon the evidence that is brought out in court, and you apply those facts to the law that Judge Cain was telling you about in the Court's charge, and thereby, render a verdict. Do you feel like you can do that?

"A. After listening to everything?

"Q. Yes, ma'am.

"A. Well, I probably could render a verdict. Like I said, I still go back. I'm not going to do this to make you ques-

tion me, but I don't know about the death penalty, I'm not going to say, I just don't know."

When the prosecutor asked if she could take and follow her oath as a juror in the case, the venireman responded, "Well I hope that you don't give me that oath, then, in that case, because I don't want to get up there—you know if I take the oath.... I just hope I'm not put in the position where I have to hand down the death penalty on anyone." The venireman, thereafter, became emotionally upset and the judge called a short recess. Comments made by the judge in the record indicate that the potential juror started crying during the voir dire. The venireman, however, did make one thing clear during her examination by the State. She indicated that at no time could she act as foreman and find appellant guilty of capital murder:

"Q. If you were elected foreman of the jury at the punishment phase of a capital murder trial and—and the State had proven beyond a reasonable doubt that the questions, one, two and three, should all be answered yes, and the jury found that they were answered yes, could you sign your name on that verdict form?

"A. No. I don't want to sign my name on it.

"Q. Could you under any circumstances?

"A. I just would not want to do it. I just would not want that responsibility. I just would not want to do it.

"Q. Is there any way that you could do it ...?

"A. None that I know of, unless you made me. That would be the only way. But I don't want it."

The venireman was as uncertain in responding to the defense attorney's questions as she was in answering the prosecutor's questions—again repeatedly indicating that she did not know how she would answer the issue particular to the case.

---

tion the trial court actions in excusing the potential juror for hardship reasons, we will not review whether the judge abused his discretion in also excusing the venireman for any other

reason. See *Demouchette v. State,* 731 S.W.2d 75, 82 (Tex.Cr.App.1986) cert. denied, 482 U.S. 920, 107 S.Ct. 3197, 96 L.Ed.2d 685 (1987).

She did indicate, however, that she thought the death penalty to be appropriate in cases where a child or elderly person has been harmed.

Finally, after the State and appellant finished their examinations, the trial court asked the potential juror if she could assume the responsibility of weighing the facts and rendering the appropriate verdict. The venireman responded:

"I don't know. I can't say I would or I wouldn't I just honestly don't know. Like I said, its hard. It's something hard to live with, any way you look at it. It's just me. I'm speaking personally of myself. Some people might can do it and go to bed and think nothing about it. I don't know that I could do that."

Ultimately, the judge made the following ruling:

"The Court feels it would, from your tears, your anguish and your look right now ... you are so emotionally disturbed about it I feel sure I'm not going to put you in that position.

"So the Court is going to sustain the challenge for cause and excuse you. You will not have to take the oath."

*Venireman Brown:*

Venireman Brown was also examined by the trial court, the State and the defense. Throughout his examination by the State and the defense, the venireman indicated that he did not believe in the death penalty and would vote "no" on one of the special issues so as to prevent the imposition of death. He was unwavering in his position. The trial court then presented a hypothetical situation to the potential juror where a mother after being raped is killed along with her child to see if the venireman could answer the special issues in the affirmative. The following exchange took place:

"MR. BROWN: No, because I feel like that person done that, had to be something wrong with him at that particular time to do that, and that's why ... I'm against the death penalty.

"THE COURT: Again we get back to the question of the answer to those three questions. Could you answer all three of them yes in any case?

"MR. BROWN: No, sir.

"THE COURT: Where the death penalty's involved?

"MR. BROWN: No. If the death penalty's involved, no sir, I could not answer all three, because it would be for something that I did not believe in."

Thereafter, the trial court sustained the State's challenge for cause.

*Venireman Hill:*

During the course of the voir dire examination of venireman Hill, the following colloquy took place:

"THE COURT: Was it your statement to the Court that you could not, under any circumstances, vote the death penalty for a person?

"MS. HILL: Yes, sir.

"THE COURT: Was it also your statement to the Court that you would automatically vote against the death penalty in a case.

"MS. HILL: Yes, sir.

"THE COURT: Do you still feel that way about it this morning?

"MS. HILL: Yes, sir.

"THE COURT: And it's your statement also to the Court that you could not answer the two or three questions that would be submitted to you [i]n the punishment phase of the case which, if you answered—all answered yes, under the law, would in our state, would mandate or cause me as a Judge to pronounce the death penalty; that is judgment—judgment assessing the punishment of the Defendant over here, death by lethal injection?

"MS. HILL: Yes, sir."

After this exchange the trial court excused the venireman for cause.

*Venireman Smith:*

Venireman Smith was unwavering in her convictions that the death penalty prevented her from either taking her oath as a juror or would cause her to distort her responses to the special issues. The trial

judge concluded the examination; he asked:

"THE COURT: I want to ask you these questions. You were very solid in the way you felt about the death penalty. But I'll just ask you a couple [of] questions. If you were given the oath, would you have the same reservation about assessing the death penalty after you took the oath as you had before you took the oath?

"MS. SMITH: Yes, sir.

\* \* \* \* \* \*

"THE COURT: All right. If you were given the oath and you knew that all yes answers to the two and possibly three questions submitted to you would mean that you would obligate the Judge of this Court, me, to assess the death penalty, would you give all those yes answers that would cause me to assess the death penalty?

"MS. SMITH: No."

The trial court thereafter, excused the venireman upon the State's challenge for cause.

*Venireman Wells:*

Finally, appellant asserts that the trial court improperly excused for cause venireman Wells. The venireman clearly stated that he was opposed to the death penalty. When asked if he could take his oath as a juror, the venireman responded. "I guess with the two alternatives, I guess I could take it, the life or death." The prosecutor then asked, "[You would] [t]ake the oath, but with the understanding that [you would be] looking only at the life alternative ...?" The venireman responded that the prosecutor was correct. The trial court took up the examination after the defense had finished its voir dire. Among the questions that the trial court asked is the following:

"THE COURT: See, I went over this with you back there. The Court's charge will tell the jury if you answer all the issues submitted by the court yes, then the Judge of the Court is obligated by law to assess the punishment of death for a person the jury has found guilty of capital murder.

"See to assess the punishment of death for a person the jury has found guilty of capital murder[,] [t]he jury answers all three questions. Now, my question to you was, would it be possible for the State to bring you enough evidence to convince you to answer those—all those issues yes knowing that under the law I, as the judge, would have to, in view of those three yes answers or two yes answers, sentence the defendant to death by lethal injection. If it would not be possible your answer would be no. If it would be possible your answer would be yes. Or if you just don't believe so, I don't believe so. But what is your answer in your own mind?

"MR. WELLS: Let me put it, I don't believe so."

After this exchange, appellant's counsel objected. He implicitly conceded, however, that the potential juror's responses had been adequate to excuse him from service on the jury; after the trial court had posed its question and had received responses thereto, counsel stated, "At some appropriate time, I need to attempt to rehabilitate him.... I don't wish to go any further at this time...." The trial court then sustained the State's challenge for cause and no attempts were made thereafter to rehabilitate the venireman.

■ In the trial court, the proper standard to be used in disqualifying prospective jurors in death penalty cases is whether their views would prevent or substantially impair the performance of their duties as jurors in accordance with the instructions given by the court and the oaths taken by the jury. *Davis v. State*, 782 S.W.2d 211, 216 (Tex.Cr.App.1989) cert. denied, —— U.S. ——, 110 S.Ct. 2193, 109 L.Ed.2d 520 (1990); *Bell v. State*, 724 S.W.2d 780, 794 (Tex.Cr.App.1986) cert. denied, 479 U.S. 1046, 107 S.Ct. 910, 93 L.Ed.2d 860 (1987); *Sharp v. State*, 707 S.W.2d 611, 620 (Tex. Cr.App.1986) cert. denied, 488 U.S. 872, 109 S.Ct. 190, 102 L.Ed.2d 159 (1988). See *Lockett v. McCree*, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986) (noting that those who firmly believe that the death penalty is unjust may not be disqualified

from jury service so long as they state that they are willing to set aside their own beliefs in deference to the rule of law). "This standard does not require a juror's bias or prejudice [to] be proven with unmistakable clarity." *Davis*, 782 S.W.2d at 216, quoting *Ellis v. State*, 726 S.W.2d 39, 43 (Tex.Cr.App.1986) cert. denied, 480 U.S. 926, 107 S.Ct. 1388, 94 L.Ed.2d 702 (1987).

▉ On appeal, we recognize that great deference must be afforded the trial court judge who is in the best position to see and hear the prospective jurors and to evaluate their responses. As stated by the Supreme Court:

"We note[ ] that the question whether a venireman is biased has traditionally been determined through voir dire culminating in a finding by the trial judge concerning the venireman's state of mind. We also note[ ] that such a finding is based upon a determination of demeanor and credibility that [is] peculiarly within the trial judge's province. Such determinations are entitled to deference ... on direct review." *Wainwright v. Witt*, 469 U.S. 412, 428, 105 S.Ct. 844, 854, 83 L.Ed.2d 841 (1985).

Moreover, in those situations, where the venireman's responses demonstrate an uncertainty as to how she will act as a juror in accordance with her views on the death penalty, we must afford the trial court even greater deference in his determination that the juror should be excused for cause.

"This is because determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of catechism. What common sense should have realized experience has proved: many veniremen cannot be asked enough questions to reach the point where their bias has been made 'unmistakably clear'; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their feelings. Despite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law.... [D]eference must be paid to the trial judge who sees and hears the juror." *Wainwright v. Witt*, 469 U.S. at 424–426, 105 S.Ct. at 852–53 (footnote omitted).

As such, this Court will reverse a ruling on these issues "when the record shows a clear abuse of discretion on the trial court's part." *Davis*, 782 S.W.2d at 216.

From those portions of the record cited above, the judge could reasonably conclude that the five veniremen's views would "substantially impair" their abilities as jurors in this capital murder case. We find that the trial court did not abuse its discretion in sustaining the State's challenge for cause to each. Appellant's tenth point of error is overruled.

▉ As we understand his brief, appellant, in his eleventh point of error, is complaining that because Article 35.16(b), V.A.C.C.P., provides that under certain circumstances only the State may challenge a particular venireman for cause,[10] the Article results in a "denial of due process of law as well as the equal protection of the laws." Appellant's Brief at p. 32. Appellant directs our attention to only one potential juror (Venireman Fotenot) who was

---

**10.** Article 35.16(b) and (c) provides:

"(b) A challenge for cause may be made by the State for any of the following reasons:
"1. That the juror has conscientious scruples in regard to the infliction of the punishment of death for crime, in a capital case, where the State is seeking the death penalty;
"2. That he is related within the third degree of consanguinity or affinity to the defendant; and
"3. That he has a bias or prejudice against any phase of the law upon which the State is entitled to rely for conviction or punishment.

"(c) A challenge for cause may be made by the defense for any of the following reasons:
"1. That he is related within the third degree of consanguinity or affinity to the person injured by the commission of the offense, or to any prosecutor in the case; and
"2. That he has a bias or prejudice against any of the law applicable to the case upon which the defense is entitled to rely, either as defense to some phase of the offense for which the defendant is being prosecuted or as a mitigation thereof or of the punishment therefor."

excused for cause after being challenged by the State when the venireman indicated, although somewhat ambiguously, that he could not assess a sentence of more than fifty years for the lesser included offense of murder.[11] Upon this venireman being excused by the trial court, however, defense counsel merely stated, "Please note our exception ... to the Court's ruling."

In order to preserve a complaint for appellate review, a party must have presented to the trial court a timely objection, stating the specific grounds for the ruling he or she desired the court to make. Tex. R.App.P. 52(a). See also *Cisneros v. State*, 692 S.W.2d 78, 83 (Tex.Cr.App.1985); *Goodrich v. State*, 632 S.W.2d 349, 349 (Tex.Cr.App.1982). Further, it is a rule of appellate procedure that the issue on appeal must comport with the objection made at trial; otherwise, nothing is preserved for review. *Euziere v. State*, 648 S.W.2d 700, 703–704 (Tex.Cr.App.1983).

When it is clear to this Court that the parties at trial understood that the intended purpose of "an exception" to the trial court's ruling was meant to be an objection that the potential juror was not disqualified because she could set aside her feeling regarding the death penalty to fulfill her obligations as juror, this type of response has been held to be sufficient to preserve the "*Witherspoon* error" for appellate review. See *Nichols v. State*, 754 S.W.2d 185, 193 (Tex.Cr.App.1988) cert. denied, 488 U.S. 1019, 109 S.Ct. 819, 102 L.Ed.2d 808 (1989). In this case, however, it is not at all clear to this Court that the parties at trial understood appellant's "exception" to the trial court's ruling to be the objection he now raises on appeal. Because the complaint advanced on appeal was never ad-

vanced in the trial court, we overrule appellant's eleventh point of error.

In his final point of error, appellant avers that the evidence is insufficient to sustain the verdict for two reasons. Appellant first asserts that the testimony of the accomplice witness was insufficiently corroborated. See Article 38.14, V.A.C.C.P. Second, he asserts that there is insufficient evidence of specific intent to kill as alleged in the indictment. We disagree.

Among other evidence corroborating that of the accomplice witness, we find it significant that the State introduced the testimony of several of appellant's acquaintances to whom appellant had admitted killing the priest. One of these acquaintances testified that on two separate occasions, while he and appellant passed in front of the church, appellant admitted that he had killed the priest. The witness testified that on a third occasion appellant described the details of murder and told him that the priest "was down on his knees, you know, and he just blowed (sic) his brains out." Appellant told the witness that the priest was praying when he shot him. This testimony is consistent with the forensic evidence showing the entry wound in the victim's neck area and the exit wound in the left side of the back; there were abrasions on the victim's knees. The witness also testified that appellant related to him that he had to kill the priest because "David Wayne knew him, and they didn't have no (sic) choice."

Moreover, appellant's girlfriend testified that soon after the burglary appellant gave her a rosary ("some black beads with a cross on it") along with a "locket." Father Bouchie's brother-in-law identified the "locket" as a pyx [12] that he had given to Father Bouchie.

---

**11.** Quite confusing to us, appellant also directs our attention to two veniremen (Veniremen Mayfield and Hill) who were excused for hardship reasons. See Article 35.03, Section 1, V.A.C.C.P. ("Except as provided by Sections 2 and 3 of this article, the court shall then hear and determine excuses for not serving as a juror, and if the court deems the excuse sufficient, the court shall discharge the juror or postpone the juror's service to a date specified by the court"). He also directs our attention to one venireman (Venireman Dark) who was disqualified to serve

because of a conviction for theft. See Articles 35.16(a)(2) and 35.19, V.A.C.C.P., Clearly, the trial court's dismissal of these veniremen provides no support for appellant's argument.

**12.** The brother-in-law testified that a pyx is a small receptacle used to carry the sacrament of Holy Communion to those unable to attend Mass in person. He described this particular pyx as:

"similar in fashion to a hollowed-out pocket watch, a little bit thicker. This particular pyx

Appellant's admissions of guilt along with his possession of the victim's property soon after the murder is sufficient to corroborate the accomplice's testimony. See *Cockrum v. State*, 758 S.W.2d 577, 579–582 (Tex.Cr.App.1988). See generally *Reed v. State*, 744 S.W.2d 112, 126 (Tex.Cr.App. 1988) and the cases cited therein. Also, that appellant armed himself prior to the burglary of the rectory along with the admissions that he had to kill the victim because he could be identified are sufficient to prove a specific intent to kill. See *Cannon v. State*, 691 S.W.2d 664, 675 (Tex.Cr. App.1985) cert. denied, 474 U.S. 1110, 106 S.Ct. 897, 88 L.Ed.2d 931 (1986); *Thompson v. State*, 691 S.W.2d 627, 630 (Tex.Cr. App.1984) cert. denied, 474 U.S. 865, 106 S.Ct. 184, 88 L.Ed.2d 153 (1985). Accordingly, we overrule appellant's twelfth point of error.

The judgment and sentence of the trial court are affirmed.

CLINTON, J., concurs in the result.

TEAGUE and STURNS, JJ., not participating.

is silver, [with] an evenly shaped cross ... in the center with a ring of crowns going around the outer perimeter. There is also two hearts on that pyx. A heart at the clip, where the press would go down to release the opening. And there was a smaller heart which was directly underneath."

The brother-in-law further testified that the pyx he had given to Father Bouchie was unique in its design.