NUMBER 13-07-00264-CR



COURT OF APPEALS



THIRTEENTH DISTRICT OF TEXAS



CORPUS CHRISTI - EDINBURG 


 

 

ADRIAN RIOS, Appellant,


v.



THE STATE OF TEXAS, Appellee.

 


On appeal from the 94th District Court


of Nueces County, Texas.


 


MEMORANDUM OPINION



Before Justices Rodriguez, Garza, and Vela


Memorandum Opinion by Justice Garza
 


 Appellant, Adrian Rios, was convicted on two counts of arson causing bodily injury,
a first-degree felony. See Tex. Penal Code Ann. § 28.02(a)(2)(A), (d)(1) (Vernon Supp.
2007). The trial court sentenced Rios, a habitual felony offender, to forty years'
confinement on each count, with the sentences to run concurrently. Rios now appeals,
contending that: (1) the evidence was insufficient to establish that the offense occurred
within the limits of an incorporated city or town; (2) the evidence was insufficient to
establish that Rios knew that the offense occurred within the limits of an incorporated city
or town; and (3) he received ineffective assistance of counsel. We affirm.

I. Background


 On July 15, 2006, Crystal Salinas and Jessica Sanchez visited a nightclub in Corpus
Christi, Texas, where they became involved in an altercation with Rosanna Torres Juarez
and Terry Garza. Afterward, Salinas and Sanchez went to their residence at 2107 Shirley
Street in Corpus Christi, where they lived with Andres Ybanez, Ybanez's four siblings,
Ybanez's mother, and Salinas's children. Juarez and Garza returned to Garza's house. 
At the time, Juarez was Rios's girlfriend and Garza was the girlfriend of Ernesto Gonzalez. 
Gonzalez had previously resided with the Ybanezes at another address.

 The following evening, Juarez borrowed her mother's truck and drove to a "game
room" in Odem, Texas with Rios, Gonzalez, Garza, Angel Moreno and Sam Rodriguez. 
While there, Moreno overheard Juarez, Rios, Gonzalez and Garza discussing the fight that
occurred the night before. Moreno also heard Rios and Gonzalez discuss their intent to
"kick some guy's ass." The group returned to Garza's residence at around midnight, at
which point Juarez, Garza, and Moreno entered the house while Rios, Gonzalez, and
Rodriguez remained outside the house talking. At some point, Juarez took two Xanax pills. 
She subsequently went outside and overheard Rios, Gonzalez and Rodriguez, express
their desire to "cocktail" the Ybanez house. According to Moreno, Rios came into the
house and asked to borrow keys to Juarez's mother's truck to "take care of some
business." Juarez and Moreno then saw Rios, Gonzalez, Rodriguez, and another man,
"Gordo," get into the truck and drive away.

 Meanwhile, Ybanez, Ybanez's sister Dina Limon, Sanchez, and Chelsea Rudisell
were returning to the Shirley Street residence in Ybanez's white Chevrolet Malibu. Ybanez
was driving, Rudisell was in the front passenger seat, and Limon and Sanchez were in the
rear passenger seats. As Ybanez pulled into the driveway of the Shirley Street residence,
Rudisell observed several men in the bed of a pickup truck approximately four houses
away. According to Rudisell, the men were holding something on fire in their hands. 
Rudisell alerted the other passengers, who all looked up. Sanchez saw three bald men in
muscle shirts holding "flames." The truck started moving slowly toward the Malibu, at
which point Limon noticed that one of the men in the truck bed had "EME" tattooed on his
arm; she recognized this tattoo as Gonzalez's.

 Four of the "flames," which were in fact Molotov cocktails, were then thrown in the
direction of the Malibu. One came in through the passenger window and landed on
Ybanez's lap, setting both Ybanez and the car ablaze. At least one other Molotov cocktail
struck the Malibu. Although Sanchez, Rudisell and Limon were able to evacuate the
inferno, Ybanez's safety belt would not unbuckle.

 Salinas and her children were sleeping inside the Shirley Street house when Salinas
heard a noise followed by screams and saw a flash of light through the window. Salinas
opened the front door to see Ybanez's Malibu engulfed in flames, with Ybanez still inside. 
Eventually, Rudisell was able to unbuckle Ybanez's safety belt, at which point others pulled
him out of the car and sprayed him with water.

 Mario Olivarez, an officer with the Corpus Christi Police Department ("CCPD"), was
dispatched to Shirley Street where he saw the Malibu still smoldering. He observed what
appeared to be human skin next to the vehicle. Also, shards of brown glass were found
in the Malibu and strewn on the driveway and street. George Alvarez, another CCPD
officer, also responded to the scene. Officer Alvarez interviewed Limon, who could not
identify or describe any suspects for him. However, Officer Alvarez did receive a
description of the truck from which the incendiary projectiles were thrown.

 After Rudisell and Ybanez were taken to the hospital, CCPD Detective Guadalupe
Rodriguez arrived at the scene, where she interviewed Sanchez and Limon, who were
reluctant to provide any information. Detective Rodriguez then visited Rudisell in the
hospital, but Rudisell was under heavy sedation and could not provide any information. 
Detective Rodriguez returned to Shirley Street, where Sanchez and Limon were more
forthcoming, describing whom they thought was involved in the attack.

 Rudisell suffered burns on her face, neck, arm and hand, and was hospitalized for
four to five days. Ybanez suffered severe burns on nearly fifty percent of his body, and lost
large portions of skin from his stomach, chest, arms, legs and face. He was later
transferred to Brooks Army Medical Center in San Antonio.

 Juarez did not volunteer any information to the police at first, but she was contacted
by the police several weeks after the incident. She stated that she was taking three
prescription medications for bipolar disorder and that she had been hospitalized previously
because of the disorder. Xanax was not one of those prescribed medicines. Juarez told
police that Rios, Gonzalez, Rodriguez, and Gordo had borrowed her mother's truck on the
night in question. Juarez told police that when the men returned, she asked Rios what had
happened, but Rios would not answer. Juarez testified at trial that when they returned,
they were acting "wound up" and told her that they had "cocktailed" Ybanez's car. 

 On September 28, 2006, a Nueces County grand jury indicted Rios, Gonzalez, and
Garza on two counts of arson causing bodily injury. See id. Count one of the indictment
stated in relevant part that the defendants:

with intent to damage and destroy a VEHICLE [did] intentionally and
knowingly START A FIRE to said VEHICLE by THROWING A CONTAINER
OF ACCELLERANT [sic] THEN ABLAZE AT SAID VEHICLE, knowing it was
within the limits of an incorporated city and town, namely, CORPUS
CHRISTI, Texas, and that bodily injury was suffered by ANDRES YBANEZ
by reason of the commission of said offense.[ (1)]


On February 27, 2007, all three defendants were re-indicted. The amended indictment
matched the original but also included allegations that Rios had two prior felony convictions
and that Gonzalez had one prior felony conviction. See id. § 12.42(c)(1), (d) (Vernon
Supp. 2007). After Garza's motion to sever was granted, the case proceeded to trial
against Rios and Gonzalez.

 At trial, Tommy Pleasant, a K-9 trainer with the State Fire Marshal's Office
("SFMO"), testified that he took a dog trained to find ignitable liquids to inspect Ybanez's
Malibu. Because the dog alerted to the driver's side floorboard, Pleasant took a sample
of the carpeting from that area. Jim Swindall, SFMO laboratory manager, testified that he
analyzed the sample and detected the presence of ignitable liquids. SFMO Captain Mark
Wagner testified that he investigated the scene of the fire and found remnants of a Molotov
cocktail. Captain Wagner stated that the damage at the scene was typical of a Molotov
cocktail attack.

 Sylvia Torres, Juarez's mother, testified that Juarez had taken her green Chevrolet
Silverado four-door pickup truck without her permission on July 16, 2006. (2) Torres stated
that she called Juarez multiple times to find out where the truck was, eventually going to
Garza's house in search of the truck. Torres testified that, as she arrived at Garza's house
at around 1:00 a.m. on July 17, 2006, the Silverado was just pulling up to the house as
well. Torres observed Rios, Gonzalez, Rodriguez, and a fourth man she did not recognize,
exit the truck. At that point, Torres got into the truck and detected an odor of gasoline.

 Also testifying for the State at trial was Kenneth Austin, an inmate at the Nueces
County jail who became acquainted with fellow inmate Rios. Austin testified that he
overheard an argument between Rios and another inmate, during which Rios said: "Hey,
don't mess with me, I'm the fire bomber. I'm famous." Austin later heard Rios tell his
cellmate: "We caught him at . . . Crosstown Greenwood. We just meant to scare him . .
. I didn't know his window was down." Austin also testified that, sometime later, he heard
Rios again say: "Yeah, I'm the fire bomber. They got me here. I'm famous." 

 Neither Rios nor Gonzalez called any witnesses to testify at trial.

 On March 28, 2007, the jury found Rios and Gonzalez guilty on both counts. Rios
pleaded "true" to the allegations contained in the enhancement paragraph of the second
indictment. Subsequently, the trial court sentenced him to forty years' confinement in the
Institutional Division of the Texas Department of Criminal Justice on each count, with the
sentences to run concurrently. Rios did not file a motion for new trial, but timely filed his
notice of appeal on April 17, 2007. (3) This appeal ensued.

II. Discussion

A. Evidentiary Sufficiency


 By his second issue, (4) Rios contends that there was insufficient evidence to show
that he knew that the offense was committed within the city limits of Corpus Christi.

 1. Standard of Review


 When reviewing the legal sufficiency of evidence, we view the evidence in the light
most favorable to the prosecution to determine whether any rational trier of fact could have
found the essential elements of the crime beyond a reasonable doubt. See Jackson v.
Virginia, 443 U.S. 307, 318-19 (1979); Watson v. State, 204 S.W.3d 404, 414-17 (Tex.
Crim. App. 2006). The trier of fact is the sole judge of the facts, the credibility of the
witnesses, and the weight given to testimony. See Tex. Code Crim. Proc. Ann. art. 38.04
(Vernon 2005); Jackson, 443 U.S. at 318-39; Beckham v. State, 29 S.W.3d 148, 151 (Tex.
App.-Houston [14th Dist.] 2000, pet. ref'd). We do not reevaluate the weight and credibility
of the evidence, whether circumstantial or direct, nor do we substitute our own judgment
for that of the trier of fact. Beckham, 29 S.W.3d at 151. Instead, we consider whether the
jury reached a rational decision. Id.

 In a factual sufficiency review, we view all the evidence in a neutral light, favoring
neither party. Watson, 204 S.W.3d at 414; Drichas v. State, 175 S.W.3d 795, 799 (Tex.
Crim. App. 2005). We then ask: (1) whether the evidence supporting the conviction is so
weak that the fact-finder's determination is clearly wrong and manifestly unjust; or (2)
whether conflicting evidence so greatly outweighs the evidence supporting the conviction
that the fact-finder's determination is manifestly unjust. Watson, 204 S.W.3d at 414-15,
417; Johnson v. State, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000). To reverse under the
second ground, we must determine, with some objective basis in the record, that the great
weight and preponderance of all the evidence contradicts the verdict. Watson, 204 S.W.3d
at 417. A factual sufficiency review requires the reviewing court to consider all of the
evidence. Marshall v. State, 210 S.W.3d 618, 625 (Tex. Crim. App. 2006).

 2. Analysis

 Section 28.02 of the Texas Penal Code provides in relevant part as follows:

A person commits an offense if the person starts a fire, regardless of
whether the fire continues after ignition, or causes an explosion with intent
to destroy or damage:


 . . .


 (2) any building, habitation, or vehicle:


 (A) knowing that it is within the limits of an incorporated city or
town . . . .


Tex. Penal Code Ann. § 28.02. 

 Rios does not challenge the sufficiency of the evidence showing that he started a
fire with intent to cause damage to a vehicle. He merely contends that there was no
evidence showing that he knew the vehicle was "within the limits of an incorporated city or
town." We disagree.

 When knowledge of the defendant must be established, it can be shown by
independent facts and circumstances indicative of such knowledge. Mouton v. State, 627
S.W.2d 765, 768 (Tex. App.-Houston [1st Dist.] 1981, no pet.). In Mouton, the court found
independent facts and circumstances sufficient to show that defendant knew the vehicle
he set fire to was located within an incorporated city. Id. Specifically, the court noted that:

[t]he State established that the appellant had lived in the incorporated area
of Houston where the offense occurred when he was between the ages of
seven and twelve; that his girlfriend's brother lived in the neighborhood; that
the appellant's brother, the complainant, lived in the neighborhood[;] and that
the appellant himself had lived at his brother's house where the offense
occurred for a few months in 1978.


Id.; see Bella v. State, 792 S.W.2d 542, 545 (Tex. App.-El Paso 1990, no pet.) (finding that
a jury could have rationally concluded that the defendant knew the building she set fire to
was located within an incorporated city, based partly on "the common knowledge
characteristics of the described location").

 Here, independent facts and circumstances provided a rational basis for the jury to
have concluded that Rios knew the vehicle he set fire to was located in Corpus Christi. For
example, the evidence established that Rios was living in Corpus Christi at the time of the
events in question. Sanchez identified the 2107 Shirley Street residence on an aerial
photograph of the area that was introduced as the State's exhibit number one; the
photograph showed that the house was located in a dense residential neighborhood with
utility lines, swimming pools, and street lights clearly visible. Juarez testified that she, Rios,
Gonzalez, and Garza drove back "from Odem to Corpus" on the night in question. She
further testified that, after Rios and Gonzalez left with the keys to her mother's truck, they
returned 45 minutes later. Austin testified that he overheard Rios say: "We caught him at
. . . Crosstown Greenwood." This constituted some evidence that Rios was familiar with
the city.

 Viewing the evidence in the light most favorable to the prosecution, see Watson,
204 S.W.3d at 414-17, we find that a rational trier of fact could have found beyond a
reasonable doubt that Rios knew the crime took place within the city limits of Corpus
Christi. See Mouton, 627 S.W.2d at 768. Accordingly, there was legally sufficient
evidence to support the verdict. See Beckham, 29 S.W.3d at 151. Moreover, the jury's
conclusion was not clearly wrong, manifestly unjust, or against the great weight and
preponderance of the evidence. See Watson, 204 S.W.3d at 414-15, 417. Rios's second
issue is overruled.

B. "Incorporated City or Town"

 By his first issue, Rios contends that there was legally and factually insufficient
evidence adduced at trial to show that Corpus Christi is an "incorporated city or town." 
Rios is correct that there was no evidence adduced at trial regarding the incorporation of
Corpus Christi. However, a court may take judicial notice that a city or town is
incorporated. See Gonzalez v. State, 723 S.W.2d 746, 750-51 (Tex. Crim. App. 1987); see
also Tex. Loc. Gov't Code Ann. § 9.008(b) (Vernon 2008) ("Recorded charters or
amendments are public acts. Courts shall take judicial notice of them, and no proof is
required of their provisions.").

 In Gonzalez, the court of criminal appeals considered whether a conviction could be
based upon an indictment that failed to state that San Antonio, the city within which the
alleged offense was committed, was incorporated. The court found that the incorporation
of the city was susceptible to judicial notice because "its existence is so easily
determinable with certainty from sources considered reliable, it would not be good sense
to require formal proof." Gonzalez, 723 S.W.2d at 751 (citing 1 Roy R. Ray, Texas
Practice: Texas Law of Civil and Criminal Evidence, § 151, at 193 (3d ed. 1980)). 
Therefore, the court held that the omission of an allegation of the fact of incorporation was
not fatal to the indictment. Id. at 752.

 Here, unlike in Gonzalez, the indictment included sufficient allegations as to the
incorporation of the city. We are instead asked whether a lack of evidence of incorporation
bars a conviction under section 28.02(2)(A) of the penal code. We hold that it does not,
because such a fact is capable of being judicially noticed. "A judicially noticed fact must
be one not subject to reasonable dispute in that it is either: (1) generally known within the
territorial jurisdiction of the trial court; or (2) capable of accurate and ready determination
by resort to sources whose accuracy cannot reasonably be questioned." Tex. R. Evid.
201(b). The United States Census Bureau website provides a list of incorporated cities in
Texas. See U.S. Census Bureau, "Table 4: Annual Estimates of the Population for
Incorporated Places in Texas, Listed Alphabetically: April 1, 2000 to July 1, 2007,"
available at http://www.census.gov/popest/cities/SUB-EST2007-4.html (last visited Aug.
22, 2008). The city of Corpus Christi is listed as an incorporated city. Id. Therefore, we
may take judicial notice of the fact that Corpus Christi is incorporated. See Payan v. State,
199 S.W.3d 380, 383 n.4 (Tex. App.-Houston [1st Dist.] 2006, pet. ref'd) (taking judicial
notice that the city of Brookshire is incorporated because it is included on the Census
Bureau list); see also Hayden v. State, 155 S.W.3d 640, 647 (Tex. App.-Eastland 2005,
pet. ref'd) (taking judicial notice of information found on website); Fullylove v. State, No.
13-00-169-CR, 2001 Tex. App. LEXIS 8009, at *5-6 (Tex. App.-Corpus Christi Nov. 29,
2001) (not designated for publication) (taking judicial notice that the offense of murder is
a felony although no evidence was produced as to that fact).

 Because we may take judicial notice that a particular city is incorporated and
because we take notice that Corpus Christi is an incorporated city, we hold that it was not
necessary that the State present evidence to prove that Corpus Christi was incorporated. 
See Payan, 199 S.W.3d at 383. Accordingly, Rios's first issue is overruled.

C. Ineffective Assistance of Counsel

 By his third issue, Rios contends that the failure of his trial counsel to request an
accomplice witness jury instruction with respect to Juarez's testimony amounted to
ineffective assistance of counsel. We disagree.

 1. Standard of Review

 To establish a claim for ineffective assistance of counsel, Rios must show: (1) his
attorney's representation fell below an objective standard of reasonableness; and (2) there
is a reasonable probability that, but for his attorney's errors, the result of the proceeding
would have been different. Strickland v. Washington, 466 U.S. 668, 684 (1984);
Hernandez v. State, 726 S.W.2d 53, 57 (Tex. Crim. App. 1986); Jaynes v. State, 216
S.W.3d 839, 851 (Tex. App.-Corpus Christi 2006, no pet.). Whether this test has been
met is to be judged on appeal by the totality of the representation, not by any isolated acts
or omissions. Jaynes, 216 S.W.3d at 851. The burden is on the appellant to prove
ineffective assistance of counsel by a preponderance of the evidence. Id.

 Our review of counsel's representation is highly deferential, and we will find
ineffective assistance only if the appellant overcomes the strong presumption that his
counsel's conduct fell within the wide range of reasonable professional assistance. See
Strickland, 466 U.S. at 689; Jaynes, 216 S.W.3d at 851. The acts or omissions that form
the basis of appellant's claim of ineffective assistance must be evidenced by the record. 
See Thompson v. State, 9 S.W.2d 808, 814 (Tex. Crim. App. 1999); Jaynes, 216 S.W.3d
at 851. In most cases, a silent record which provides no explanation for counsel's actions
will not overcome the strong presumption of reasonable assistance. Mallett v. State, 65
S.W.3d 59, 63 (Tex. Crim. App. 2001); Thompson, 9 S.W.3d at 813-14. "These
demanding standards are virtually impossible to meet when no proper evidentiary record
was developed at a hearing on a motion for new trial." Chavero v. State, 36 S.W.3d 688,
701 (Tex. App.-Corpus Christi 2001, no pet.). As the court of criminal appeals has noted:

A substantial risk of failure accompanies an appellant's claim of ineffective
assistance of counsel on direct appeal. Rarely will a reviewing court be
provided the opportunity to make its determination on direct appeal with a
record capable of providing a fair evaluation of the merits of the claim
involving such a serious allegation. In the majority of instances, the record
on direct appeal is simply undeveloped and cannot adequately reflect the
failings of trial counsel.


Thompson, 9 S.W.3d at 813-14 (footnote omitted).

 2. Analysis

 As previously noted, Juarez testified at trial that she heard Rios and Gonzalez
saying they were going to "cocktail the house" before they left in her mother's truck. On
cross-examination, Rios's trial counsel asked Juarez whether Rios had gone into Garza's
house to ask for the keys to Juarez's mother's truck. The following exchange then
occurred:

Q. [Rios's counsel] Adrian, you say, goes back into the house and asks to
borrow the keys?


A. [Juarez] Yes.


Q. So you give him the keys?


A. Yes.


Q. Well, doesn't that make you a party to this offense, too? 
You're helping them to do all of this, whatever they're
going to do?


A. How does that make me possible [sic] of being with
them?


Q. Well, you've given them the keys to go do this crime. 
You're helping them, aren't you?


A. I don't completely say it's - that I'm helping them.


Q. Well, you gave them the keys and you knew - what
you're testifying to, you knew what they were going to
do -


THE COURT: Is that a question?


Q. [Rios's counsel] - isn't that correct?


A. Yes.


Q. Okay. Have you been indicted?


A. No.


Q. And you haven't been charged with this crime, have
you?


A. I don't see why I should.


 Rios contends that this testimony by Juarez, along with her statement that Rios and
Gonzalez had told her they were going to "cocktail" Ybanez's house, constituted an
"admission" by Juarez that she had participated in the crime as an accomplice. See Druery
v. State, 225 S.W.3d 491, 498 (Tex. Crim. App. 2007) ("An accomplice is someone who
participates with the defendant before, during, or after the commission of a crime and acts
with the required culpable mental state."). Moreover, Rios claims that since Juarez's
"admission" was uncontroverted, "she should be considered an accomplice as a matter of
law and the jury should have been instructed accordingly." See Tex. Code Crim. Proc.
Ann. art. 38.14 (Vernon 2005); (5)
 Blake v. State, 971 S.W.2d 451, 455 (Tex. Crim. App.
1998) (stating that, if there exists no doubt or the evidence clearly shows that a witness is
an accomplice witness as a matter of law, the court is under a duty to so instruct the jury.);
DeBlanc v. State, 799 S.W.2d 701, 708 (Tex. Crim. App. 1990) (same). "Alternatively,"
asserts Rios, "the jury should have been instructed to decide the issue." See Blake, 971
S.W.2d at 455 ("If the evidence is conflicting, it is proper to leave the question of whether
an inculpatory witness is an accomplice witness as a matter of fact to the jury under
instructions defining the term accomplice."). Rios states that his trial counsel's failure to
request such an instruction amounted to ineffective assistance of counsel.

 We note that Juarez's statement at trial was far from a clear "admission" that she
had participated in the crime as an accomplice. However, even if counsel erred in failing
to request an accomplice witness instruction, we do not judge counsel's performance by
any isolated acts or omissions; rather, we look at the totality of the representation. Jaynes,
216 S.W.3d at 851. Because the record does not indicate why Rios's trial counsel declined
to ask for an accomplice witness instruction, we cannot say that the "strong presumption"
of reasonable assistance has been overcome. See Mallett, 65 S.W.3d at 63.

 We conclude that Rios has not met his burden to show by a preponderance of the
evidence that his counsel was ineffective. See Jaynes, 216 S.W.3d at 851. Accordingly,
his third issue is overruled.

III. Conclusion

 We affirm the judgment of the trial court.


 

 DORI CONTRERAS GARZA,

 Justice


Do not publish.

Tex. R. App. P. 47.2(b).

Memorandum Opinion delivered and 

filed this the 26th day of August, 2008.

1. The indictment also included a second count, which was identical to the first count, except that it
referenced the bodily injury suffered by Rudisell rather than Ybanez.
2. Juarez claimed that she had permission from her mother to borrow the truck.
3. On March 19, 2007, the trial court signed a certification of Rios's right to appeal. See Tex. R. App.
P. 25.2(a)(2), (d). Gonzalez is not a party to this appeal.
4. We address Rios's issues out of order in the interest of convenience.
5. Article 38.14 of the Texas Code of Criminal Procedure provides that "[a] conviction cannot be had
upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant
with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the
offense." Tex. Code Crim. Proc. Ann. art. 38.14 (Vernon 2005).