Opinion filed March 10,
2011

 

                                                                       In The

                                                                              

  Eleventh
Court of Appeals

                                                                   __________

 

                                                         No. 11-09-00247-CR 

                                                    __________

 

                            ALEX
RICARDO SALDANA, Appellant

 

                                                             V.

 

                                      STATE
OF TEXAS, Appellee



 

                                   On
Appeal from the 238th District Court

 

                                                          Midland
County, Texas

 

                                                   Trial
Court Cause No. CR35352

 



 

                                            M
E M O R A N D U M   O P I N I O N

            This
case involved the firing of a gun by appellant, Alex Ricardo Saldana, in the
parking lot of a Whataburger in Midland early in the morning of November 16,
2008.  Appellant was indicted for the murder of Stephen Adams and for
aggravated assaults against Derek Raymond Schwartz, Gerald Sikorski, Corey
Heflin, and William Russell Jr.  The jury found appellant guilty of all counts
and assessed a sentence of sixty years confinement for the murder and ten years
confinement for each of the aggravated assaults.  A $10,000 fine was assessed
for each count.

            On
appeal, appellant argues in four issues that the trial court erred (1) in
allowing the detective in charge of this case to give her opinion on
appellant’s mental state, (2) in denying appellant’s motion for change of venue,
(3) in denying appellant’s Batson[1]
challenge, and (4) in failing to order a mistrial after a detective commented
that appellant’s clothing could be associated with a gang.  We affirm.

Background
Facts

            Appellant
and his girlfriend, Veronica Armendariz, drove into the parking lot of Whataburger
and parked appellant’s tan Ford Taurus near the entrance.  While Armendariz was
vomiting just outside the passenger side, appellant got out to urinate by the
car.  Derek Raymond Schwartz and Gerald Sikorski drove up in a blue Mazda with
the car radio playing loudly.  One or both made loud remarks to appellant to
the effect that appellant should go inside to urinate.  Appellant testified
that the two men approached him in a threatening manner, but he acknowledged
that neither had a weapon.  Appellant showed them that he had a gun, a .40
caliber Glock.   Appellant said that, to scare them, he fired one shot to the
side that was aimed at the trunk of the Mazda.  Schwartz and Sikorski retreated
and went inside.  

            Appellant
then backed his car up; Armendariz’s window was rolled down.  Although Schwartz
and Sikorski testified that they were inside Whataburger at that point,
appellant claimed that Schwartz ran toward the passenger side of appellant’s
car as he was starting to drive forward.  Appellant testified that he then
fired three shots to the side of Schwartz to keep him away.  One of those shots
killed Stephen Adams who was standing behind his pickup talking to Corey Heflin
and William Russell Jr.  Because the shots were being fired at them, Heflin and
Russell hit the ground when Stephen Adams fell.  Appellant drove off and was
apprehended about fifteen minutes later at his home.

            Tonya
Tuck and her friend, Eden, were in the last vehicle in the drive-through line
at the Whataburger.  They heard a shot that came from near the entrance of the
parking lot, and Tuck saw sparks from a gun held by a person standing by a gray
or tan Ford Taurus.  According to Tuck, the person then got back into the Ford
Taurus.  After the car had backed up, they heard four more shots, saw a man
fall, and saw the Ford Taurus drive away.  Tuck called 911 and gave the
dispatcher the license number of the Ford Taurus.  While she was still on the
phone with the dispatcher, Tuck went over to try to help the victim with CPR.  Tuck
testified that she did not see anyone else with a weapon.  She did not see
anyone rush toward the Ford Taurus or do anything threatening to the shooter. 
There were no shots from anyone else in the parking lot except the person in
the Ford Taurus.

             
Judith Missy Adams, the next witness, testified that the victim, Stephen Adams,
was her husband.  That night, she, Mr. Adams, and their daughter Kresha Darlene
Adams had gone to The Hog Pit and then to The Ranch.  Because Kresha wanted to
get something to eat, they went to the Whataburger before going home.  After
they pulled into a parking space, Kresha went inside, but Mr. and Mrs. Adams
stayed in the pickup.  Mrs. Adams said that something hit the back of the pickup
that shook the whole pickup.  Mr. Adams got out to see what had hit their pickup. 
He walked around to the back of the pickup.  Two men walked up, and Mrs. Adams
said that they were laughing and talking.  Mrs. Adams then saw a car about to
drive out the exit and saw a girl in the car with dark glasses facing her.  Suddenly,
she heard four or five popping sounds, and all three men went down.  She walked
to the back of the pickup, saw her husband, and knew he was gone.  Mrs. Adams
tried to give him CPR and ended with having his blood all over her.  Mrs. Adams
did not hear shots from anywhere other than from the small car.  She did not
know appellant or Armendariz.

            Kresha
confirmed that she went inside to order.  As she opened the door after getting
her food, she heard four gunshots.  She then saw her mother getting out of the pickup
and  her father lying on the ground.  He was bleeding from the top of his head,
and blood was coming from his mouth.  Kresha testified that, while she was
waiting for her food, there was no big scuffle or commotion going on out in the
parking lot.  Kresha also did not know appellant or Armendariz.

            Schwartz
testified that he and Sikorski had been at Woofers and Tweeters.  He was
driving his blue Mazda.  When he got out of the car, Sikorski was talking to
someone “across the parking lot.”  Schwartz remembered hearing Sikorski say,
“What’s up?” as to a friend.  They were not trying to pick a fight.  According
to Schwartz, the next thing he remembered was that the other fellow said, “I’m
from D-Town,” and Schwartz then saw something shining in his hand.  Schwartz
said he turned and walked away.  Schwartz said that he could tell that the man
was not happy.  He then heard a gunshot from behind him where the man was
standing.  He and Sikorski went inside to use the restroom; they heard a few
more shots while they were inside.

            When
they walked out, Schwartz saw the victim with blood everywhere, and he then saw
a bullet hole in the trunk of his car.  Schwartz testified that he did not say
anything to provoke a fight with appellant and that he did not have a weapon. 
Schwartz did say that he felt threatened with bodily injury by appellant’s gun. 
Schwartz did not know appellant or Armendariz.

            Sikorski
testified that, as they pulled into the parking lot, he saw a man urinating
next to his car.  He told the man that he should go inside.  Sikorski said that
he had to scream at appellant because they had the music turned up very loud.  Sikorski
said that the man said, “What’s up?” so they said, “What’s up?”  Then,
appellant fired a gun at Sikorski.  Sikorski saw the gun go off and felt
something whiz by him.  Sikorski is familiar with the muzzle flash and sound of
a Glock; he said that the gun sounded like a Glock.  The bullet hit the pickup
that was beside Sikorski.  Sikorski said he walked away to go inside to
urinate.  While he and Schwartz were in the restroom, they heard three more
gunshots.  When they went back outside, they heard a girl scream and saw a
woman giving the victim chest compressions.

            Sikorski
testified that they did not hear gunshots come from anywhere other than from
the man who had been urinating.  He said that neither he nor Schwartz had any
type of weapon. Sikorski also testified that he felt that he had been
threatened with bodily injury.  Sikorski admitted that he and Schwartz had
spoken to the man, but said, “We weren’t trying to be confrontational.”  

            Corey
Heflin, a student at Midland College, testified that he was sitting in his pickup
waiting for friends to get their food inside when he heard a gunshot.  He got
out of his pickup to see what happened and met Mr. Adams and William Russell
Jr. by the Adamses’ pickup.  He then heard the next gunshot, and Mr. Adams fell
just in front of him.  When he heard that second gunshot, he saw a man inside a
tan Ford Taurus pointing a gun at them through the passenger window.  When he
saw Mr. Adams fall, Heflin dropped to the ground.  He could tell that Mr. Adams
was seriously injured.

            Heflin
testified that they had not said anything to the man in the Ford Taurus and
that none of them had made any type of threatening or aggressive gesture toward
the man.  He also said that none of them had a weapon of any type.  Heflin said
that he did not know appellant or Armendariz.  One of the shots hit Heflin’s pickup,
which was next to the Adamses’ pickup.  Heflin also testified that he felt
threatened with bodily injury and that there had been no gunshots coming from
anywhere other than from the Ford Taurus.  Heflin said that he did not see
anyone make a threat toward the occupants of the Ford Taurus, nor did he see
anyone exhibit a weapon or fire a shot at the Ford Taurus.

            William
Russell Jr. testified that he had just come out of the Whataburger with his
food. Russell, Heflin, and Mr. Adams were trying to figure out what was going
on.  The three were standing between the Adamses’ red pickup and a tan pickup. 
Russell identified appellant at trial as the same man in the parking lot who
began shooting at them that night.  Russell said that he could see both
appellant and a girl in the Ford Taurus.  Russell heard appellant say, “What [are]
you looking at?”  Russell said that they were looking at appellant trying to
figure out what was going on when appellant began firing at them through the
passenger window.  Appellant was driving the Ford Taurus but shot through the
passenger window.  Because he was from a military family, Russell said that he
knew it was a .40 caliber pistol from the sound.  Russell thought that
appellant fired six shots at them.  When Mr. Adams and Heflin went down, Russell
also ducked with them.

            Russell
said that he saw that Mr. Adams had been injured and that, after the Ford
Taurus left, he went back inside to tell them that someone had been shot.  Russell
did not see anyone other than appellant with a gun that night.  He did not hear
shots from anywhere other than from the Ford Taurus.  He did not hear any words
exchanged between Mr. Adams or anyone else and appellant.  None of the three
men had weapons, and none had made any aggressive acts toward the people in the
Ford Taurus.  During cross-examination, Russell admitted that he had told an
officer that night that appellant had been shooting wildly and that the bullet
that hit Mr. Adams might have ricocheted.  In his testimony at trial, however,
he was clear that appellant had shot at them.

            Lon
Stuart Platt, a retired federal magistrate, resided near the Whataburger.  He
was awake at the time and heard a shot at 2:02 a.m.  He then heard three more
rounds go off fifty-four seconds later.  He drove to the HEB across from Whataburger
and parked because he feared that an officer might have been involved in a
shooting.  He saw a bullet hole in the fender of a pickup.  After speaking with
an officer, he left.

            Patrol
Officer Jesus Primera Robledo III of the Midland Police Department testified
that he was the first officer to arrive at the scene.  He saw a woman
performing mouth-to-mouth resuscitation and a man doing chest compressions on a
man who appeared to be dead.  There was blood everywhere.  The EMS arrived as Officer
Robledo was getting his first aid kit from his patrol car.  Officer Robledo
found stainless steel .40 caliber Smith & Wesson casings and one brass .40
caliber casing by the entrance where the Ford Taurus had been.  He also found a
Glock magazine with hollow points in the parking lot.  He remembered seeing two
puddles, one by the fence where someone had parked and gotten out of their car
and the other was vomit.  At the time, he was looking at the scene with Melissa
Nay of the Midland Police Department Identification Section.

            Travis
Skinner, another officer with the Midland Police Department, was dispatched to
3603 Louisiana, the address registered to the license plate number of the Ford
Taurus.  Three other officers – Sergeant Grimaldo, Officer Pizana, and Officer
Truex – were on the scene when Officer Skinner arrived.  Because no one was
there, they parked their cars down the street.  A few minutes later, a Ford
Taurus pulled into the driveway, and the officers saw a male driver and a
female passenger.  The driver followed their commands to turn off the vehicle,
drop the keys out the window, and show the officers his hands.  When the driver
got out, Officer Truex placed handcuffs on him.  Officer Skinner identified
appellant as the driver that night.

            Officer
Truex asked the driver that night if there were any firearms in the vehicle. 
Appellant first said, “No, there is not,” but then he changed his answer.  He
said that there was one underneath the front seat.  The officers found a .40
caliber Glock Model 27.  State’s Exhibit 45, a recording from Officer Skinner’s
in-car camera that was made that night at 3603 Louisiana, was then played for
the jury.  Officer Skinner said that he took appellant to the police department
where appellant was interviewed by Detective Kay Therwhanger. 

            Sergeant
Alfredo Grimaldo confirmed that he also was sent to 3603 Louisiana in Midland. 
The officers were about to leave when the Ford Taurus drove up.  Sergeant
Grimaldo said that there was a woman in the passenger seat and a child in the
baby seat in the back.  Detective Grimaldo confirmed that they found a .40
caliber Glock underneath the driver’s seat.  They also found a brass shell
casing in the front driver’s seat and a brass shell casing in the backseat
area.

            Detective
Therwhanger first interviewed Armendariz, who said that she was not married to
appellant but that he was the father of her two young children.  Because
Detective Therwhanger was not getting consistent stories from Armendariz, she
went to the next room, gave Miranda[2]
warnings to appellant, and interviewed him.  Detective Therwhanger then
went to the scene to talk with the officers there before returning to talk with
appellant again.  She looked at the scene, the physical evidence in the car and
at the scene, the photographs, and the witnesses’ statements.  When Detective
Therwhanger  returned, she read appellant the Miranda warnings again and
then recorded an interview with appellant.  The interview was played for the
jury.

            When
asked by the prosecutor what she did next, Detective Therwhanger said that she
placed appellant under arrest for murder. When asked why, Detective Therwhanger
testified, over objection, that she obtained a warrant because it was her
“opinion he intentionally and knowingly shot his gun in the direction of at least
four or five people, and hit one of them and killed him.”  Detective
Therwhanger said that her opinion was based on the investigation at the scene,
the physical evidence in the car, the physical evidence at the scene,
statements of the witnesses, and what appellant had told her.

Detective
Therwhanger testified that a .40 caliber shell casing was found near where
appellant said that he parked his car.  She said that the “throw-up” on the
pavement in the parking lot was consistent with appellant’s statement that
Armendariz threw up outside the car. There was a blank spot where appellant’s
car was parked and next to it was fluid that looked like urine.  There was a
brass .40 caliber shell casing found next to where appellant parked.  The
location of that shell casing was too far away to be a casing from appellant’s
shots fired from in the car through the passenger window.  Detective
Therwhanger pointed out that the shell casings from his shots while driving the
car would have discharged inside the car, and the officers found three spent
.40 caliber shell casings in the Ford Taurus: one in the front seat and two in
the backseat. 

When
asked what appellant was wearing that evening, Detective Therwhanger said that
he was wearing a red, white, and blue striped shirt and dark-colored jeans that
had red stitching of some sort on the pockets.  The prosecutor then asked if
the red stitching or that type of clothing had any significance.  Detective
Therwhanger replied, “[I]t was very flashy clothing. It could be associated
with a gang.”  The defense objected, and the court instructed the jury to
disregard the statement.  The court overruled the defense’s motion for a
mistrial.

Detective
Therwhanger testified that they performed gunshot residue tests on the hands of
appellant, Armendariz, and Mr. Adams.  They tested the hands of Mr. Adams
because appellant had said that someone had shot at him.  Detective Therwhanger
noted that no other witness indicated that anyone was shooting a weapon except
appellant.

Melissa
Nay, an identification specialist for the Midland Police Department, testified
that she was trained in crime scene processing and had taken pictures of the
scene.  She photographed Armendariz’s hands and did gunshot residue tests on
them.  She also took a photograph of appellant’s hands.  There was a tattoo of
a red star on one hand.  The defense objected, arguing that the admission of
that photograph would allow jurors to speculate about his possible gang
membership.  The trial court overruled his objection.  The defense also
objected to the introduction into evidence of photographs of appellant when his
clothes were collected.  The prosecutor argued that it was important that the
State be able to show that appellant had not been harmed in any way that
night.  The trial court overruled the objection, and Nay testified that the
photographs showed that appellant did not have any injuries on his body.  Photographs
of the bullet that went through the trunk of the Mazda, through a speaker, and
into the backseat were also introduced.  Numerous photographs confirmed the
testimony of the witnesses as to the damage to the various cars and pickups. 
There were two bullet holes in the victim’s pickup.

David
Clark, the identification section supervisor, confirmed that there was a Glock
semiautomatic handgun and three spent .40 caliber casings inside the Taurus.  The
State then introduced the autopsy report from the medical examiner’s office in
Tarrant County and the gunshot residue results from the victim’s hands.  The
report showed that there was no gunshot residue on Mr. Adams’s hands.

Kelly
Belcher, the Senior Trace Analyst with the Tarrant County Medical Examiner’s
Office, explained how she uses a scanning electron microscopy to analyze
gunshot residue test samples.  She testified that she found gunshot residue on
the “right back hand” of appellant and on his “left back hand,” indicating that
appellant had shot a firearm.  Armendariz also had gunshot residue on her
hands, indicating that she had either shot a firearm or was in the vicinity of
a discharging firearm.  Belcher testified that there was no gunshot primer on
the hands of the victim, Stephen Adams.  The report prepared by her was
introduced into evidence.

Jeffery
Jerek Brown works for the Texas Department of Public Safety in the Firearm and
Toolmark Section.  His job is to determine whether a fired cartridge case or a
fired bullet came from a particular firearm.  He found that the four fired .40
caliber Smith & Wesson casings were fired from the Glock pistol.  He also found
that three of the four fired bullets were fired from the Glock.  The fourth
bullet, found in the Mazda, was not suitable for comparison.

Detective
Therwhanger was recalled as a witness and asked about her statements in the
recording of the statement by appellant.  The prosecutor first noted that
Detective Therwhanger had said to appellant that she knew he did not mean to
intentionally shoot someone and that it might have been an accident or in
self-defense.  The prosecutor then asked Detective Therwhanger whether, when
she said that, she believed that appellant had not intentionally shot the
victim.  Detective Therwhanger explained her statement was a tactic used in
interrogations.  Because of the evidence Detective Therwhanger had at that
time, she believed that appellant was not being truthful.  At that point in the
interrogation, appellant was not admitting to doing any of the shooting. 
Detective Therwhanger said that she did not believe the shooting was accidental
or unintentional.  The trial court overruled the defense objection that
Detective Therwhanger’s statement was an inappropriate opinion based on
speculation.

Lauren
Cotton is a caseworker with Child Protective Services.  She was involved in an
investigation of appellant as the parent of two children.  Cotton testified
that appellant brought up the subject of a murder that had occurred at the Whataburger. 
Appellant said that he was not intoxicated that night, that he and Armendariz
were driving down Midkiff, and that someone in another vehicle had cut them
off.  He then pulled into the Whataburger parking lot.  Armendariz was sick,
stepped out, and vomited.  Appellant said that he got out of the car and that three
young men walked toward him talking “s--t” to him.  He said that he pulled out
a gun from the car and fired one shot in the air to scare them off.  He and Armendariz
got back in the car, and he rolled down her window in case she became sick
again.  After he backed out his car, he saw a car out the passenger window with
four young men in it.  Appellant said that he thought they were the same young
men and that they were talking to him as before.  Appellant described to Cotton
how he reached across Armendariz and began to shoot at the other car.

Cotton
testified that appellant did not ever say that anyone was shooting at him or
that anyone had threatened him with a weapon.  Nor did appellant tell her that
anyone in a vehicle or black pickup shot at him.  At the request of the
prosecutor, the trial court said it would take judicial notice that the
indictment was returned on November 25, 2008, and that Cotton’s report was
dated January 12, 2009.  The State then rested.

Appellant
testified on his own behalf.  He and Armendariz were at Harry’s Lounge for about
two and one-half hours on the evening of November 15.  He admitted drinking
alcohol there, but added that no one stopped serving him.  He and Armendariz
left just before closing time, which was 2 a.m.  They were going to pick up
their children who were with Armendariz’s mother.  Armendariz became sick so he
pulled into the very last parking spot, facing the fence, in the Whataburger
parking lot.  While Armendariz was vomiting, appellant went to the front of the
car to relieve himself.  

While
he was relieving himself, a dark-colored Mazda came in honking and with music
blasting.  Appellant said that he was about to get in his car when the
passenger in the Mazda got out and asked, “[W]hat the F was [he] doing?” 
Appellant said that he replied with the same statement.  According to
appellant, the two men began walking toward him and threatening him verbally.  Appellant
reached under the driver’s seat and pulled out a .40 caliber Glock.  He fired
one shot as a warning, just to show them that he was armed.  Appellant
testified that the men then ran around two vehicles in separate directions.  He
told Armendariz, “Let’s go,” and he rolled down her window in case she needed
to throw up again.  He then backed the car up.

Appellant
testified that he was just about to drive forward when he heard yelling outside
the passenger window and saw the driver of the Mazda running toward them. 
According to appellant, the driver yelled, “Do you want to F with us?” 
Appellant said that he told the driver, “I don’t even know you.  I told you I’m
not from here. . . . I’m from D-Town.”

            Appellant
said that he pulled out the Glock again and fired three rounds to the side of
the driver to keep him away long enough for appellant to drive away.  He
claimed that he did not see three men standing behind a pickup because his
focus was on the driver of the Mazda.  He admitted again that he fired the
three shots.  After firing the shots, appellant went to pick up one of his
children and then went straight home to 3603 Louisiana.  Appellant claimed that,
when he was picked up, he did not believe that he had shot anyone.

            During
cross-examination, appellant admitted that he had had “[a]t the most, six
drinks” during the period between 11:30 p.m. and 2:00 a.m. at Harry’s Lounge. 
Appellant admitted that he had lied to Detective Therwhanger when he told her
that he pulled into the parking lot because someone in a black or white pickup
had started shooting at him and that he had lied when he told her that someone
had shot at him first and that he saw the black pickup again in the parking
lot.  In answer to the question, “So there was no black pickup.  You made all
of that up?” he answered, “Yes.”

 Appellant
also admitted that, as Schwartz and Sikorski came toward him talking in a
violent way, the two men did not hold any weapon toward him.  They were just
walking aggressively.  Appellant said that he did not pay attention to their
hands because he was retrieving his weapon from under the driver’s seat.  When
asked whether the driver had a gun when he ran toward the passenger side later,
appellant said that he did not know whether the driver was armed or not; he
just felt threatened.  He testified that he meant to just shoot the blue Mazda,
but he admitted that he missed and that one bullet hit the side of the pickup
that belonged to the Adamses.  He also admitted that apparently another bullet
from his gun killed Stephen Adams and the third bullet hit the pickup that
belonged to Heflin.  

The
defense rested, and the prosecutor called Kristine Ford in rebuttal. Ford
acknowledged that she had a conversation with appellant regarding guns. 
Appellant told Ford that he was not a fighter.  Ford testified that appellant
said that “he would rather just use his guns and get the occurrence over and
done with, rather than fight.”  The evidence was then closed.

After
closing arguments, appellant was found guilty on all five counts.  The jury
assessed punishment at sixty years confinement for the murder conviction and
ten years each for the aggravated assault convictions.

Appellant’s
Motion to Change Venue

            In
appellant’s second issue, he argues that the trial court erred when it denied
his motion for change of venue.  Section 31.03(a)(1) of the Texas Code of
Criminal Procedure provides that a change of venue may be granted if the
defendant establishes that “there exists in the county where the prosecution is
commenced so great a prejudice against him that he cannot obtain a fair and
impartial trial.”  Tex. Code Crim. Proc.
Ann. art. 31.03(a)(1) (Vernon 2006).  Appellant, however, had a heavy
burden to prove the existence of such a prejudice in the community.  Nethery
v. State, 692 S.W.2d 686, 694 (Tex. Crim. App. 1985). 

            A
pretrial hearing on appellant’s motion was held.  Appellant offered ten
exhibits of publicity and affidavits by individuals in support of his motion.  Widespread
publicity by itself is not considered inherently prejudicial.  Gonzalez v.
State, 222 S.W.3d 446, 449 (Tex. Crim. App. 2007); Renteria v. State,
206 S.W.3d 689, 709 (Tex. Crim. App. 2006).  Jurors do not have to be totally
ignorant of the effects and issues of a particular case. Renteria, 206
S.W.3d at 709; DeBlanc v. State, 799 S.W.2d 701, 704-05 (Tex. Crim. App.
1990).  To prevail on a motion to change venue, a defendant must demonstrate
that publicity about the case is pervasive, prejudicial, and inflammatory.  Gonzalez,
222 S.W.3d at 449; Renteria, 206 S.W.3d at 709.  On appeal, the standard
of review is whether the trial court abused its discretion in refusing to grant
the change of venue.  If the trial court’s decision concerning a motion for a
change of venue falls within the zone of reasonable disagreement, it will be
upheld.  Gonzalez, 222 S.W.3d at 449.

            The
two primary means of discerning whether publicity is pervasive, prejudicial,
and inflammatory are a hearing on the motion to change venue and the voir dire
process.  Id.  The trial court in this case used both, deferring its
decision until after voir dire.  

            In
examining whether the pretrial publicity is prejudicial and inflammatory, a
trial court may take three matters into consideration:  (1) the nature of the
publicity, (2) any evidence presented at a change of venue hearing, and (3)
testimony received from veniremembers at voir dire.  Gonzalez, 222
S.W.3d at 451.  News stories that are accurate and objective are generally
considered not to be prejudicial or inflammatory.  Id.

The
five newspaper articles and eight articles that appeared on mywesttexas.com
introduced by appellant at the pretrial hearing were accurate and objective in
their coverage. That coverage was not prejudicial or inflammatory.  Appellant
also introduced a number of adverse comments by readers that followed a story;
all but one were dated between November 17 – 22, 2008.  One blogger defended
appellant.  Appellant also introduced a number of affidavits from individuals
asserting that appellant could not have a fair trial in Midland County.  Appellant
relied on Harvey v. State, 887 S.W.2d 174 (Tex. App.—Texarkana 1994, no
pet.), to support his venue motion.

The
facts in Harvey differed substantially from this case.  There, a wife
was charged with solicitation of her husband’s murder in Titus County.  Titus
County had 9,359 households.  The local newspaper had a circulation of over
4,400 of those households and ran several front page articles, banner
headlines, other news stories, and letters to the editor regarding the case
over a period of time of less than a year from the husband’s murder to the
beginning of the wife’s trial.  Rumors were spread that she practiced
witchcraft, and the local police officials spoke openly with the press about
the case.  “[I]nformation coming from the sheriff’s department was that they
could not quite pin it down, but they thought it was the widow who had murdered
him.”   Harvey, 887 S.W.2d at 177.  Midland County has over 100,000
residents, and the State pointed out that fact to the trial court.  The trial
court took the matter under advisement until after voir dire.

            At
the outset of voir dire, the trial court informed the jurors that the trial
involved a shooting at Whataburger and asked members of the panel to raise
their hand if they had heard or read from any source a report that purported to
be the facts of the case.  The record is silent as to how many raised their hands. 
The court then asked if any of them had established an opinion as to appellant’s
guilt or innocence.  Six of the seventy-six member venire panel raised their
hands.  After the State completed part of its voir dire, twelve (including the
six) were challenged for cause and excused.  Every member of the panel appears
to have been asked if he or she had heard or read about the case.  Many said
they had.  None were asked whether they had read the blogger opinions expressed
in mywesttexas.com.  Although a number of other potential jurors were
challenged for cause and excused, the record reflects that only seven were
challenged because they had formed an opinion of guilt or innocence based on
what they had heard or read about the case.  

            Appellant
emphasizes that the majority of the panel had heard about the case.  As the court
noted in Gonzalez, this fact is not sufficient to conclude that the
entire community was “infected” by the pretrial publicity.  Gonzalez,
222 S.W.3d at 450.  More important is the consideration that the reporting was
factual, and the trial court was within its discretion to believe the jurors’
assurances that they had not formed an opinion on guilt or innocence. 
Appellant argues that the jurors were not candid because all of those who
answered they had heard of the case had not raised their hands when the State
began its voir dire.  As we noted, the trial court at the very beginning asked
the panel to raise their hands if they had heard or read about the case;
however, the record is silent as to how many raised their hands.

The
prosecutor also included in her question the important condition of whether any
person, based on what they had heard or read, had already made up their mind or
could not “base their decision strictly on what they hear in the courtroom.”  To
answer the prosecutor’s question, the juror had to have (a) heard or read about
the case and (b) formed an opinion on guilt or innocence.  Before the voir dire
questioning was concluded, there was only one additional member who said that
she had formed an opinion on guilt or innocence.  The record does not show that
there was a lack of candor.

            Appellant
refers to the State’s explanation, in response to a Batson challenge,
that it used a peremptory strike on Ms. Zuniga (a television station employee)
because the State did not believe her statement that she did not remember much
about the case.  Appellant then argues that this example demonstrates that “the
State agrees the media coverage affected the jurors’ veracity.”  Even if the
State were correct in its belief concerning Ms. Zuniga, which it may not have
been, it does not follow from one example that the veracity of the entire panel
should have been in question.

            Appellant
also argues that the affidavits filed by the State were insufficient to
controvert the affidavits that he filed; therefore, the trial court should have
granted his change of venue motion as a matter of law.  In support, appellant
cites Turner v. State, 641 S.W.2d 383 (Tex. App.—El Paso 1982, pet. ref’d). 
Turner was overruled by the Court of Criminal Appeals’s opinion on the
State’s motion for rehearing in Lundstrom v. State, 742 S.W.2d 279, 286
(Tex. Crim. App. 1986).  There the court concluded that the dissenting opinion
on original submission was correct, and the court adopted it, affirming this
court.  The Court of Criminal Appeals held that controverting affidavits filed
by the State are not limited to addressing only the credibility of the affiants
supporting venue change or the adequacy of their basis of knowledge. 
Affidavits in support of the State’s position, as here, may generally deny that
there exists so great a prejudice against the defendant or a dangerous
combination against the defendant that he cannot expect a fair trial.  Lundstrom,
742 S.W.2d at 286; see 42 George E. Dix & Robert O. Dawson, Texas
Practice: Criminal Practice & Procedure § 25.28 (2d ed. 2001).  That is
what the State did in this case.  And the fact that all but seven of the
seventy-six potential jurors stated that they remembered hearing something
about the event, but had not formed an opinion, could be considered by the
trial court in determining whether there was or was not so great a prejudice
against appellant that he could not expect a fair trial.

            The
Texas Court of Criminal Appeals in the earlier case of Henley v. State,
576 S.W.2d 66, 72 (Tex. Crim. App. 1978), listed seven relevant factors for the
trial court to consider in determining whether media attention affected the
public.  Even considering those factors, appellant did not meet his burden for
a change of venue.  The nature of the pretrial publicity in the newspapers and
mywesttexas.com was objective.  Government officials were asked about the
event, but there is no evidence that they released any statements that were not
accurate and objective.  It did not appear from the record that very many
people on the panel remembered much about the event by the time of the trial. 
Midland County, the area from which the jury was drawn, has a population of
over 100,000.  There were, no doubt, many events that vied for the attention of
the populace between November and the following July.[3] 
There was no evidence of any factor that was likely to affect the candor or
veracity of the prospective jurors.

            The
trial court did not abuse its discretion in overruling appellant’s motion for
change of venue.  Appellant’s second issue is overruled.

Appellant’s
Batson Challenge

            In
appellant’s third issue, he argues that the trial court erred in overruling his
Batson challenge that was made after the State used seven of its eleven
peremptory challenges against veniremembers with Hispanic surnames. Appellant
is Hispanic.  In analyzing this issue, it is important to keep in mind that the
holding in Batson was based on the Equal Protection Clause.  Use of a
peremptory challenge to strike a potential juror because of race violates the equal
protection guarantee of the United States Constitution. 

            A
defendant’s Batson challenge is a three-step process.  First, the
defendant must make a prima facie showing of racial discrimination based on the
prosecutor’s conduct.  If the defendant makes the prima facie showing, the
burden shifts to the State to present a race-neutral reason for its challenged
strike, a reason that is a clear and reasonably specific explanation of the
legitimate reasons for exercising its strike.  The defendant should then have
the opportunity to rebut the State’s explanation.  Simpson v. State, 119
S.W.3d 262, 268 (Tex. Crim. App. 2003).

            When
reviewing a trial court’s ruling on a Batson challenge, the appellate
court applies a “clearly erroneous” standard.  Gibson v. State, 144
S.W.3d 530, 534 (Tex. Crim. App. 2004); Yarborough v. State, 947 S.W.2d
892 (Tex. Crim. App. 1997).  The standard is “highly deferential” to the trial
judge.  Gibson, 144 S.W.3d at 534.  A ruling is clearly erroneous if,
after a review of the entire record, the appellate court is left with the
definite and firm conviction that a mistake has been committed.  Whitsey v.
State, 796 S.W.2d 707, 721 (Tex. Crim. App. 1989).

            It
is not clear that appellant made a prima facie showing of racial discrimination. 
The mere use of a strike against a Hispanic veniremember does not in and of
itself establish a prima facie case of racial discrimination.  Aguilar v.
State, 826 S.W.2d 760, 763 (Tex. App.—Fort Worth 1992, pet. ref’d). 
Appellant’s sole reason for his Batson challenge was that the State used
seven of its eleven peremptory challenges on members with Hispanic names.  The
trial court asked the following of appellant:

            THE
COURT: Which ones are you alleging that were made with not racially neutral
reasons?  I mean, there are a large portion of the jury panel is Hispanic,
including some of your challenges for cause.

 

            [DEFENSE
COUNSEL]:  I would just have to leave it at that.  I think we made a prima
facie case.

 

Without
more reasons and facts, this court cannot conclude that the State’s conduct in
this case excluded venirepersons from the jury on the basis of race.  We note
that eight of those with Hispanic names were challenged for cause by appellant
and excused because they could not consider probation for aggravated assault or
the low end of punishment.  After all the challenges for cause, it appeared
that forty-two potential jurors were left.  Nevertheless, the State provided
reasons for its peremptory challenges.

            The
State explained that it struck five of the seven potential jurors because they
were single with young children and might have empathy for appellant’s wife and
two children.  As to some of the five, the State gave additional reasons:  Elizabeth
Montoya did not respond well to the State’s questions, especially on
punishment; Gina Vasquez did not finish high school; Ms. Zuniga indicated that
she did not have weapons at her house or believe there is a right to bear arms,
and she worked at the television station but did not remember much about the
case; Kimberly Baeza’s body language did not respond well to the State’s
questions, and the State had recently put an individual named Carlos Baeza in
prison for intoxication manslaughter.  The State explained that it struck Jose
Villegas because he is single with young children at home.  Because the State
had struck single females with young children, the State felt it should also
strike males who were in that situation.

The
prosecutor explained that she struck Mr. Mireles because he would not look at her
when she questioned him, because he said it would “depend” if he could give the
minimum sentence, and because the State had prosecuted other defendants with
the same last name.  Appellant found that several other potential jurors (of
both races) gave the same answer of “it depends.”  But appellant has now had
time to search the record for details as opposed to the State’s limited time to
consult its notes concerning the jurors.  Appellant argues that the State
should have asked Mr. Mireles if any of his relatives had been prosecuted by
the State.  Again, the State’s reason could have applied to anyone who had the
same last name as defendants the State had prosecuted.  We cannot say that
reason was racially motivated even if the State was mistaken.

The
State explained that Eric Mendez had stated that he did not know how to judge
credibility when the State asked him what he would look for in a witness to
determine whether they were telling the truth.

The
State gave three reasons for striking Ms. Zuniga who worked as a news media
assistant for a television station:  (1) she did not believe that one should
have the right to bear arms, (2) she was not believable when she said that she
did not know much about the case, and (3) she was single with children.  Appellant
suggests that the State may have been confused concerning the first reason
because Ms. Zuniga’s answer came when defense counsel was asking each potential
juror if he or she owned a firearm and did that member believe people should
have the right to bear arms.  After asking the double question numerous times,
members of the panel began answering both questions without counsel repeating
the two questions.  As to the third reason, appellant argues that the State
improperly relied on juror sheets.    

            The
State gave reasons for its peremptory strikes that appeared to be race
neutral.  See Grady v. State, 730 S.W.2d 191 (Tex. App.—Dallas 1987), vacated
on other grounds, 761 S.W.2d 19 (Tex. Crim. App. 1988); Chambers v. State,
724 S.W.2d 440, 442 (Tex. App.—Houston [14th Dist.] 1987, pet. ref’d).  The
challenge to single parents who might have sympathy for appellant’s children
could apply to single parents of any race.  The process for assessing and
judging credibility of a witness is key for any juror.  Appellant did not
request an opportunity to rebut the State’s explanations.  Unless the
discriminatory intent is inherent in the State’s explanations of its strikes,
the reasons offered by the State will be deemed race neutral.  Guzman v.
State, 85 S.W.3d 242, 246 (Tex. Crim. App. 2002).  

            Appellant
relies on Greer v. State, 310 S.W.3d 11 (Tex. App.—Dallas 2009, no
pet.).  But  Greer is not helpful to our analysis.  The Greer court
first emphasized that the State used all of its peremptory strikes against
African-Americans, who made up only 27% of the venire (8 out of 30
veniremembers).  We are unable to tell by the record how many Hispanics were
members of the much larger venire panel in this case.  And the State in this
case did not use all of its strikes against Hispanics; only seven of its eleven
strikes were against Hispanics.

            Another
reason given by the Greer court in holding that the State’s reasons were
pretextual was that comparative juror analysis made the State’s explanations
for striking Juror No. 2 implausible.  Juror No. 7 was very similar to Juror
No. 2 except that she was white, yet the State did not strike Juror No. 7.  In
our case, appellant has not furnished us comparative juror analysis except for
the answers relating to the minimum sentence.  And by not requesting a rebuttal
opportunity below, appellant deprived the trial court of any evidence or
arguments that would have shown that the State’s strikes were actually racially
motivated.  Appellant’s third issue is overruled.

Detective’s
Opinion on Appellant’s Mental State

            In
appellant’s first issue, he argues that the trial court erred in allowing a
police detective  at two different times in the trial to express her opinion
that appellant intentionally committed murder.  The State first asked Detective
Therwhanger why she obtained a murder warrant for the arrest of appellant. 
Detective Therwhanger replied as follows:

            Due to
the investigation at the scene, the physical evidence in the car, the physical
evidence at the scene, the witnesses, and what he had just told me, and how I
learned what the scene looked like – I saw photographs.  It was my opinion that
he intentionally and knowingly shot his gun in the direction of at least four
or five people, and hit one of them and killed him.

 

            




 

            Later
in the trial, Detective Therwanger was called for redirect and asked about some
statements she made to appellant during the course of her interrogation of him:

            Q.  . . .
I noticed when you took the statement from Mr. Saldana, you said several things
in it like you knew he didn’t mean to intentionally shoot someone, it might
have been an accident or it might have been in self-defense.  When you said all
those things, do you believe all those things?

 

            A.  No,
I do not.

 

            Q. 
Well, why did you say that to him?

 

            A.  . .
. Because it is an interrogation . . .  [H]e was not being truthful in the very
beginning . . . [I]t is a tactic in interrogations to . . . maybe get him to
admit to something lesser than what it really is.  It is just a way to get them
to confess, if that’s a good word to say.

 

            Q.  So
by empathizing with the person you are interviewing, you kind of get them to
relax .  .  . and give you more information?

 

            A.  In a
way, yes.  It is a way to give them an out, so to speak, to where if they don’t
want to admit to actually, intentionally shooting somebody, then maybe they
will admit to it being an accident; because at that point he wasn’t admitting
to doing any of it.

 

            Q.  . .
. So the mere fact that you said you thought he was remorseful, or you thought
that this had been an accident or wasn’t intentional . . . that’s just
interrogation techniques that you have been taught to utilize over the years,
correct?

 

                        A. 
That’s correct.

 

            Q. 
Did you believe any of those things?

 

            A. 
That it was accidental or nonintentional?

 

            Q. 
Correct.

 

            A. 
Absolutely not.

 

            The
standard for reviewing a trial court’s decision to allow opinion testimony from
a lay witness is abuse of discretion.  It is well settled in Texas that no
witness is competent to voice an opinion as to guilt or innocence.  Boyde v.
State, 513 S.W.2d 588, 590 (Tex. Crim. App. 1974).  The intent of the
defendant is a question of fact to be determined by the trier of fact from all
the facts and circumstances of the evidence.  Hemphill v. State, 505
S.W.2d 560 (Tex. Crim. App. 1974).  Texas courts have consistently reaffirmed
the principle that the testimony of any witness regarding state of mind of
another is pure speculation and, therefore, incompetent.  Steve v. State,
614 S.W.2d 137 (Tex. Crim. App. 1981).

The
trial court erred in allowing the detective to give her opinion on appellant’s
mental state in response to the question of why she obtained a warrant. 
Although a lay opinion that is an interpretation by the witness of his or her
own objective perception of the events is normally allowed, Texas courts exclude
a lay opinion that attempts to communicate the actual subjective mental state
of an actor.  Fairow v. State, 943 S.W.2d 895 (Tex. Crim. App. 1997) (proper
to exclude opinion of codefendant that the defendant “accidentally” shot the
bar owner).  

Tex. R. Evid. 701 allows a witness to
give opinion or inference testimony provided that the opinion is rationally
based on the perception of the witness and helpful to a clear understanding of
the witness’s testimony or the determination of a fact in issue.  The Fairow
court explained that the initial requirement that an opinion be rationally
based on the perceptions of the witness is itself composed of two parts:  (1)
the witness must establish personal knowledge of the events from which his or
her opinion is drawn and (2) the opinion drawn must be rationally based on that
knowledge.  Fairow, 943 S.W.2d at 898.  

Detective
Therwhanger was not present at the scene at the time of the incident.  She had
no personal knowledge concerning the event and the veracity of any witness. 
Although Detective Therwhanger testified that she reached her opinion based on
the physical evidence in the car and at the scene, she could not have reached her
conclusion without the hearsay statements of the witnesses to the event. 
Lay-witness opinion based on hearsay is inadmissible.  McMillan v. State,
754 S.W.2d 422, 425 (Tex. App.—Eastland 1988, pet. ref’d). Detective Therwanger’s
interpretation and opinion regarding the mental state of appellant were not an
interpretation of her objective perception of events (i.e., her own senses or
experience.).  Cf. Doyle v. State, 875 S.W.2d 21 (Tex. App.—Tyler
1994, no pet.); see Fairow, 943 S.W.2d at 899.  

 
The second exchange between the prosecutor and Detective Therwhanger is slightly
more problematic.  Detective Therwhanger testified that she did not believe
that the shots were fired accidentally or unintentionally to explain her own
statements during the interrogation of appellant, which was played for the
jury.  In the recording, Detective Therwhanger had suggested to appellant that
he may not have intentionally shot someone, that it might have been an
accident, or that it might have been in self-defense.  Detective Therwhanger’s
explanation was that her statements were a tactic in interrogating appellant to
try to obtain an admission by appellant concerning the shooting.  If this had
been the only exchange, the argument that Detective Therwhanger’s answers were
admissible might be persuasive.  However, because this exchange followed the
earlier answers of Detective Therwhanger, because of the emphasis in the
prosecutor’s questions concerning accidental versus intentional, and because
the State was the proponent of this evidence, we hold that the trial court
erred in overruling appellant’s objection to the second time Detective
Therwhanger testified that appellant’s shots were intentional and not
accidental.

Nonconstitutional
errors require reversal only if the error affected appellant’s substantial
rights.  Tex. R. App. P. 44.2(b). 
A substantial right is affected when the error had a substantial and injurious
effect or influence in the determination of the jury’s verdict.  King v.
State, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997).  An accused’s
substantial rights are not affected by the erroneous admission of evidence if
the court, after examining the whole record, has fair assurance that the error
did not influence the jury or had but slight effect.  Solomon v. State,
49 S.W.3d 356, 365 (Tex. Crim. App. 2001).

In
assessing the likelihood that the jury’s decision was adversely affected by the
error, the appellate court should consider everything in the record, including
any testimony or physical evidence admitted for the jury’s consideration, the
nature of the evidence supporting the verdict, the character of the alleged
error, and how it might be considered in connection with other evidence in the
case.  Morales v. State, 32 S.W.3d 862, 867 (Tex. Crim. App.
2000).  That is why we summarized the testimony and evidence in some detail at the
beginning of this opinion.

The
prosecution did not mention Detective Therwhanger’s testimony in final
argument.  Instead, the prosecutor spent most of her time explaining the
elements of murder, manslaughter, criminal negligence, and aggravated assault
with a deadly weapon.  The prosecutor discussed  in detail the three ways the
State could prove that appellant was guilty of murder  The three methods were
included in the counts of the indictment.  See Tex. Penal Code Ann. §§ 19.01, 19.02 (Vernon 2003).  The
prosecution reminded the jury of the testimony of Russell and Heflin when
appellant fired shots at them and reminded the jury to think about the
testimony of Sikorski and Schwartz.  

Russell
testified that he saw appellant point his gun out the passenger side directly
at them and pull the trigger.  Before the shots, Russell heard appellant say,
“What are you looking at?”   Russell thought that appellant fired six shots at
them.  Heflin also said that he looked over and saw a man inside the car
pointing a gun at them through the passenger side; he was looking at them when
appellant fired the shots.  The evidence found by the police inside appellant’s
car – such as the spent shell casings – supported the testimony of Russell and
Heflin.  The forensic evidence supported their story that appellant
intentionally and knowingly fired at them or in their direction.  In his
testimony, appellant admitted that he fired the shots, but he believed that he
was firing in the direction of Sikorski or Schwartz, who testified that they
were inside the Whataburger.  

In
De La Paz v. State, 279 S.W.3d 336 (Tex. Crim. App. 2009),
Justice Cochran discussed the “doctrine of chances” and quoted the following
example from 2 John Wigmore, Evidence
§ 302 at 241 (Chadbourn rev. 1979):

[I]f
A while hunting with B hears the bullet from B’s gun whistling past his head,
he is willing to accept B’s bad aim . . . as a conceivable explanation; but if
shortly afterwards the same thing happens again, and if on the third occasion A
receives B’s bullet in his body, the immediate inference (i.e., as a
probability, perhaps not a certainty) is that B shot at A deliberately; because
the chances of an inadvertent shooting on three successive similar occasions
are extremely small.  

279 S.W.3d at
347.  That example is applicable to this case.  After Schwartz saw that
appellant had a gun, he walked away and then heard a gunshot behind him. 
Sikorski testified that he saw the gun go off, felt something whiz by him, and
saw the bullet hit the pickup by him.  While inside the Whataburger, they heard
more gunshots.

            Tuck
saw sparks from a gun held by appellant while standing by the Ford Taurus.  After
appellant got in and backed up the Taurus, she heard four more shots and saw
the victim fall and the Ford Taurus drive away.  Mrs. Adams testified that,
while her husband and the two other men were at the back of the pickup talking,
she saw a car about to drive away and saw a girl in the car with dark glasses
facing her.  She heard four or five popping sounds and saw all three men go
down.

            Appellant
testified that he felt threatened by Schwartz and Sikorski and that one of them
came up to the passenger side of his car as he was leaving.  All of the other
witnesses testified that they saw no one confront or threaten appellant.  From
the testimony of Russell, Heflin, and Mrs. Adams, it is clear that no one was
approaching the passenger side of appellant’s car.  The odds are high that
appellant intentionally and knowingly shot at Adams, Russell, and Heflin,
probably because he mistakenly took one or two of them for Schwartz or Sikorski. 
According to Russell, appellant challenged them with “What are you looking at?”
before firing several shots at them.  

            Detective
Therwhanger stated what was obvious to the jury from all the testimony.  This
was not an accidental or unintentional shooting.  Setting aside the testimony
of Detective Therwhanger, there was compelling evidence of appellant’s guilt. 
After reviewing the entire record, we find that the error did not influence the
jury or had but a slight effect.  See Solomon, 49 S.W.3d at 365. 
Appellant’s first issue is overruled.

Testimony
of Possible Gang Membership

            In
appellant’s fourth issue, he argues that the trial court erred in refusing to
grant his motion for mistrial after Detective Therwhanger mentioned possible
gang membership.  After voir dire, the State had agreed that it would not offer
evidence of gang membership during the State’s case on guilt/innocence.  The
trial court ordered the State to approach before mentioning a gang membership
or affiliation.  

            As
noted in the background facts, the State asked Detective Therwhanger if the red
stitching on appellant’s clothing had any significance.  Detective Therwhanger
replied that “it was very flashy clothing.  It could be associated with a
gang.”  The State had not asked to approach the bench before asking the
question.  The trial court sustained defense counsel’s objection but overruled
his motion for mistrial.  The trial court instructed the jury to disregard the
statement.  Photographs of appellant’s clothing were admitted over appellant’s
objection.

            Appellant
acknowledges that a mistrial is an extreme remedy for prejudicial events that
occur during the trial.  Bauder v. State, 921 S.W.2d 696, 698 (Tex. Crim.
App. 1996).  A mistrial is used to halt proceedings when the error is so
prejudicial that expenditure of further time and expense would be wasteful and
futile.  Ladd v. State, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999).  

            Gang
affiliation or the possibility thereof had nothing to do with the charges in
this case.  See Galvez v. State, 962 S.W.2d 203 (Tex. App.—Austin
1998, pet. ref’d); Macias v. State, 959 S.W.2d 332 (Tex. App.—Houston
[14th Dist.] 1997, pet. ref’d).  The statement by Detective Therwhanger was
prejudicial, and there was no reason for the State to ask the question.  The
issue, however, is whether the trial court erred in overruling appellant’s
motion for mistrial.  The denial of a mistrial is reviewed under an abuse of
discretion standard.  Trevino v. State, 991 S.W.2d 849, 851 (Tex.
Crim. App. 1999).

We
believe that any harm due to the testimony was cured by the trial court’s
instruction to disregard.  The reference was brief and only to possible gang
membership, and neither the State nor its witnesses mentioned the subject
again.  Relevant evidence was overwhelming in support of appellant’s
conviction.  The court noted in Gardner v. State, 730 S.W.2d 675, 696 (Tex. Crim. App. 1987), that, in the vast majority of cases in which testimony comes
in, deliberately or inadvertently, that has no relevance to any material issue
in the case and carries with it the potential for prejudice to the accused, the
court presumes that the instruction to disregard will be obeyed by the jury.  The
trial court did not abuse its discretion in overruling appellant’s motion for
mistrial.  Appellant’s fourth issue is overruled.

This
Court’s Ruling

            The
judgment of the trial court is affirmed. 

 

 

                                                                                    TERRY
McCALL

March 10, 2011                                                           JUSTICE

Do not publish.  See Tex. R. App. P. 47.2(b).

Panel consists of:  Wright, C.J., 

McCall, J., and Strange, J.









                [1]Batson v. Kentucky, 476 U.S. 79 (1986).





                [2]Miranda v. Arizona, 384 U.S. 436 (1966).





                [3]Appellant’s evidence included an announcement of his
arrest in the Midland Reporter-Telegram dated December 31, 2008.  However, it
is not at all clear that the announcement was one of the top stories of the
year.  The mention of his arrest was very brief (three sentences) and non-prejudicial.